**ROWLETT/2000, LTD., Appellant**

v.

**CITY OF ROWLETT, Texas, Appellee.**

No. 05-06-00520-CV.

Court of Appeals of Texas, Dallas.

Aug. 20, 2007.

Arthur J. Anderson and Brian T. Morris, Winstead Sechrest & Minick, P.C., Dallas, for Appellant.

David Berman and Robert E. Hager, Nichols, Jackson, Dillard, Hager & Smith, LLP, Paul K. Pearce, Jr., Matthews, Carlton, Stein, Shiels, Pearce, Dunn & Knott, Dallas, for Appellee.

Before Justices WRIGHT, LANG, and RICHTER.

## OPINION

Opinion by Justice RICHTER.

This case involves an inverse condemnation claim in which a developer contends the City of Rowlett's denial of its rezoning applications effected an unconstitutional regulatory taking of property. The developer, Rowlett/2000, LTD., challenges the legal and factual sufficiency of the evidence to support the jury's finding that it was not deprived of all economically viable use of the property. Because we conclude the City's refusal to rezone the property does not result in a complete elimination of the property's value and therefore does not constitute an unconstitutional taking, we affirm the judgment of the trial court.

## I. BACKGROUND

The property at the center of this dispute consists of 172.18 acres of land acquired by the developer in two purchases. The first purchase, consisting of 93 acres for which the developer paid $930,000, was made on August 16, 2000. The remaining 79.18 acres were purchased for $837,500 on July 10, 2001. Both tracts are located in Rowlett, Texas in an area zoned "SF–E" (single-family residential estate development). The area has been zoned for 1–acre minimum lots since 1967. The preamble to the original ordinance provided the purpose of the original zoning was "to provide a location for principally undeveloped land situated on the fringe of an urban area and used for agricultural purposes" and to "encourage and protect agricultural uses until urbanization is warranted and the appropriate change in the district classification is made." Both tracts were used primarily for pasture land at the time of purchase. Although the developer was not aware of the zoning when he signed the purchase contract for the first tract, he was aware of the zoning by the time of closing.

In August 2000, prior to the purchase of the second tract, the developer applied for a zoning change to allow the development of 240 lots on the 93 acres with a density of approximately 2.57 units per acre. The City Council considered and denied the application on October 17, 2000. In November 2000, the developer submitted another request to allow the development of the property with a density of 2.19 units per acre. The City Council denied the application.

In September 2001, in conjunction with revisions to the City's comprehensive plan, the preamble to the SF–E zoning regulations was changed to read "[t]his District is intended to allow the opportunity for minimum size lots that will allow for the largest lot size residential development in Rowlett. This zone is designed to promote and encourage a suitable environment for family life on relatively large parcels of land." The minimum 1–acre lot size remained unchanged. On April 1, 2003, the developer submitted another zoning application, again requesting a deviation from the 1–acre minimum lot requirement. The City Council denied the application.

The developer subsequently filed suit against the City seeking damages and declaratory relief based on allegations of inverse condemnation. The inverse condemnation claim was submitted to the jury on several different theories: economic viability, unreasonable interference, and whether the City acted with an "acquisitory intent." The jury answered "no" to all liability questions and rendered a take-nothing verdict in favor of the City. The developer filed a motion to disregard the jury findings and for JNOV which the trial court denied. The developer then filed a motion for new trial which was overruled by operation of law. See Tex.R. Civ. P. 329b(c). This appeal followed.

## II. STANDARD OF REVIEW

The constitutionality of a regulatory taking involves the consideration of a number of factual issues, but the ultimate question of whether a zoning ordinance is a compensable taking is a question of law. Nonetheless, an appellate court must consider all of the factual circumstances and rely on the trial court's findings on disputed facts to determine these legal questions. *See Sheffield Development v. City of Glenn Heights,* 140 S.W.3d 660, 673 (Tex.2004); *2218 Bryan Street, Ltd. v. City of Dallas,* 175 S.W.3d 58, 65 (Tex.App.-Dallas 2005, pet. denied).

When a party with the burden of proof challenges the legal sufficiency of an adverse finding, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001); *Long v. Long,* 196 S.W.3d 460, 466 (Tex.App.-Dallas 2006, no pet.). In reviewing a "matter of law" challenge, we must first examine the record for evidence that supports the finding. We will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem.,* 46 S.W.3d at 241; *Long,* 196 S.W.3d at 466. The issue should be sustained only if the contrary proposition is conclusively established. *Dow Chem.,* 46 S.W.3d at 241; *Long,* 196 S.W.3d at 466. We indulge every reasonable inference to support the finding, crediting favorable evidence if a reasonable jury could and disregarding contrary evidence unless a reasonable jury could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex. 2005).

When seeking review of the factual sufficiency of the evidence supporting an adverse finding on which the party had the burden of proof, the appellant must show that "the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.,* 46 S.W.3d at 241; *Long,* 196 S.W.3d at 466. The reviewing court must consider and weigh all the evidence and may set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem.,* 46 S.W.3d at 242. We are also mindful of the fact that an appellate court cannot act as a fact-finder. We are not permitted to pass on the credibility of witnesses or substitute our judgment for that of the jury. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Dallas County v. Holmes,* 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.). The amount of evidence necessary to affirm a judgment is far less than necessary to reverse a judgment. *See Hakemy Bros. Ltd. v. State Bank and Trust Co.,* 189 S.W.3d 920, 926 (Tex.App.-Dallas 2006, pet. denied).

## III. APPLICABLE LAW

*Inverse Condemnation and Regulatory Taking*

Inverse condemnation occurs when property is taken for public use without proper condemnation proceedings and the property owner attempts to recover compensation for the taking. *City of Dallas v. Blanton,* 200 S.W.3d 266, 270 (Tex. App.-Dallas 2006, no pet.). The prohibition against taking without just compensation is set forth in Article I, Section 17 of the Texas Constitution which provides:

> No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person....

TEX. CONST. Art. I § 17. Although the Texas takings provision is worded differ-

ently than the Takings Clause of the United States Constitution, it has been described as "comparable." *See Sheffield Devel. Co.,* 140 S.W.3d at 669. As a result, Texas courts typically look to federal cases for guidance on the constitutionality of a taking. *Id.* The takings clause is premised on the notion that the government should not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Steele v. City of Houston,* 603 S.W.2d 786, 789 (Tex.1980) *(quoting Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). Takings are classified as either physical or regulatory. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex.1998); *Sefzik v. City of McKinney,* 198 S.W.3d 884, 891 (Tex.App.-Dallas 2006, no pet.). With regard to a regulatory taking, both the state and federal takings provisions recognize that while " 'all property is held subject to the valid exercise of the police power,' " a regulation may, under some circumstances, constitute a taking requiring compensation. *Sheffield,* 140 S.W.3d at 669 *(quoting City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984)). In a regulatory taking, it is the passage of the ordinance that injures a property's value or usefulness. *Lowenberg v. City of Dallas,* 168 S.W.3d 800, 802 (Tex.2005) (noting "sharp distinctions" between physical takings and regulatory takings).

 The Texas Supreme Court has described the legal battlefields of regulatory taking jurisprudence as "a 'sophistic Miltonian Serbonian Bog.' " *City of Austin v.*

*Teague,* 570 S.W.2d 389, 391 (Tex.1978) (quoting *Brazos River Authority v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 105 (1962)). The entire army need not sink into this mire, however, because the United States Supreme Court recently clarified the types of regulatory taking challenges that may be made. *See Lingle v. Chevron,* 544 U.S. 528, 548, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). A party challenging a government regulation as an uncompensated taking of private property may allege: (1) a physical taking; (2) a *Lucas*-type "total regulatory taking"; (3) a *Penn Central* taking; or (4) a land-use exaction. *Id.; Sheffield Devel. Co.,* 140 S.W.3d at 671–72 (discussing types of regulatory taking challenges).[1] Moreover, although several different theories were submitted to the jury in this case, appellant asserts error only in connection with the "total regulatory taking" test.

 The regulatory taking test is described as a *Lucas* challenge because the court first attempted to articulate the justification for such a challenge in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016–1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Although a divided court expressed concern about the concept of value, there was no determination of whether the lower court's "no value" finding was correct. Because the finding was not challenged, it was not presented for the court's review. Justice Scalia writing for the majority observed: "[r]egrettably, the rhetorical force of our 'deprivation of all economically feasible use' rule is greater than its precision, since the rule does not make clear the 'property interest'

---

1. In *Lingle,* the U.S. Supreme Court rejected the "substantially advances" formula as a valid taking test. *Lingle,* 544 U.S. at 548, 125 S.Ct. 2074. Prior to *Lingle,* the Texas Supreme Court, relying on the precedent abrogated in *Lingle,* declined to recede from the application of a "substantially advances" test

for regulatory takings. *See Sheffield,* 140 S.W.3d at 671–72. Here, there is no appellate challenge involving the "substantially advances" theory. Thus, our inquiry does not involve whether the "substantially advances" test remains valid in a regulatory takings case under the state constitution.

against which the loss of value is measured." *Lucas* 505 U.S. at 1016, n. 7, 112 S.Ct. 2886. The court noted the rule does not address whether a regulation that requires a developer to leave 90% of a rural tract in its natural state would be analyzed in terms of a deprivation of beneficial use or one in which the owner has suffered a mere diminution in the value of the tract. *Id.* Appellant references this portion of the *Lucas* opinion in support of its argument that the court intended to include cases such as this one under the complete deprivation of property rubric because here, 99% of the property is left in its natural state. We believe appellant's interpretation ignores the context in which the court's concerns were expressed—a case in which "no value" was assumed.[2] Also, as appellant concedes, the ultimate outcome in *Lucas* does not advance the "valueless" analysis.[3] Despite concerns about definitional precision, the *Lucas* court held that a property owner has suffered a taking when he has been called upon to sacrifice *all* economically beneficial uses in the name of the common good. *Id.* at 1019, 112 S.Ct. 2886 (emphasis in original). The Supreme Court has since recognized that the *Lucas* holding is limited to the "extraordinary circumstance when no productive or economically beneficial use of land is permitted" and "the landowner is left with a token interest." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (citing *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886); *Lingle,* 544 U.S. at 540, 125 S.Ct. 2074. The Texas Supreme Court applies the *Lu-*

cas test to state constitutional takings. *See, Sheffield* 140 S.W.3d at 671; *Mayhew,* 964 S.W.2d at 935. We apply this standard to the record before us.

*Does the Zoning Deprive the Developer of all Value in the Property?*

The developer contends the only way to achieve an economically productive use is for the City to allow single-family development of some type. This argument not only mischaracterizes the zoning ordinance, but also misapplies the *Lucas* test upon which the argument is premised.

 The SF–E zoning does permit the development of a single-family residential subdivision, albeit in 1–acre minimum lots. The appraisal experts for both parties testified that due to market conditions and the current zoning, the cost to develop 1–acre lots would exceed the potential for revenue. The City's appraiser testified the highest and best use of the property is to hold the property for the future. The developer also introduced evidence on the profit potential for ventures other than a residential subdivision. In this regard, the developer testified he kept cattle on the property to obtain an agricultural use property tax exemption, but the agricultural use lost money. Although the testimony established development would not be profitable under current conditions, the absence of profit potential does not equate with impossibility of development. Significantly, "[t]he takings clause ... does not charge the government with guaranteeing the profitability of every piece of land subject to its authority." *Taub v. City of Deer*

---

2. After posing the hypothetical to demonstrate the rule's lack of precision, the court stated "[i]n any event, we avoid this difficulty in the present case." *Id.*

3. The Coastal Council ultimately paid Lucas over $1.5 million dollars for his lots, resold them for $785,000 each, and eventually per-

mitted the construction of substantial single-family homes on the lots. *See* Dana Beach & Kim Connolly, *A Retrospective on Lucas v. South Carolina Coastal Council: Public Policy Implications for the 21st Century,* 12 SOUTH-EASTERN ENVTL. L.J. 1, 14 (Fall 2003).

*Park,* 882 S.W.2d 824, 826 (Tex.1994). The developer asserts the original zoning was intended to be interim or temporary, subject to revision once a certain level of urbanization occurred. The City disagrees with this interpretation of the ordinance. However, even if the ordinance was intended to be temporary, the City was under no obligation to change it. Zoning determinations are vested in the discretion of municipal authorities. *See Mayhew* at 933. The zoning was in effect when the developer purchased the property and there was no guarantee the zoning would ever be changed.[4]

The jury also heard a wide range of testimony about the value of the property in an undeveloped state. The City's expert testified the property's value is approximately $5,000 per acre. The developer's expert testified the property was worth $4,500 an acre. The developer placed the undeveloped value at $2,000 an acre. The witnesses also testified the developer paid more for the property than it is worth. It was reasonable for a jury to conclude that the developer assumed certain risks attendant to real estate investment. But such risks have no place in this analysis because the government has no duty to underwrite the risk of developing and purchasing real estate. *See Taub,* 882 S.W.2d at 826. We do not read *Lucas* to state the value of a property is a function of whether it can be profitably developed.[5] According to the Texas Supreme Court, the economic viability determination "entails a relatively simple analysis of whether value remains in the property after governmental action." *Mayhew,* 964 S.W.2d at 935. The deprivation of value must be such that it is tantamount to depriving the owner of the land itself. *See Sheffield,* 140 S.W.3d at 671, n. 55.

Thus, the appropriate *Lucas* inquiry is whether the value of the property has been completely eliminated. *Lingle,* 544 U.S. at 540, 125 S.Ct. 2074. Appellant urges value is relative, and the determination of whether a property has only a "token" value must be analyzed in conjunction with the value of surrounding properties. As an example, Appellant suggests the "token" value in Dallas for an acre of land might be $25,000 because surrounding property in Dallas has a high value threshold. The developer's expert testified the value of the property in a state capable of being developed is $25,000 an acre. The combined testimony of all of the experts on both sides provides a range of value for the property in an undeveloped state from

4. Although investment-based expectations are pertinent to a *Penn Central* analysis rather than a *Lucas* analysis, we note that when such expectations are measured, the historical uses of the property are critically important. *See Mayhew* at 937; *Hallco Texas, Inc. v. McMullen County,* 221 S.W.3d 50 (Tex.2006). Here, the zoning always required 1–acre minimum lots and the historical use of the property was farmland.

5. Profit potential and investment-based expectations are components of a *Penn Central* unreasonable interference claim. A *Penn Central* analysis is implicated in those situations where there is not a complete taking, either physically or by regulation, but the regulation goes "too far", causing an unreasonable interference with the landowner's right to use and enjoy the property. *See Penn Central Transp. Co. v. New York,* 438 U.S. 104, 124–125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). There is no formulaic test for these *ad hoc* factual inquiries. Nonetheless, factors to be considered include: (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with reasonable investment-backed expectations; and (3) the character of the governmental action. *Id; see also Sheffield,* at 671–72. We agree that there has been no complete regulatory taking for purposes of *Lucas,* but note that the issue of unreasonable interference is not before us because it was neither preserved for or raised on appeal.

$2,000–5,000. According to appellant, because the property could be worth $25,000 an acre but is instead worth only $2,000–5,000 an acre, the $2,000–5,000 value is merely a token interest that constitutes no value at all. Appellant further argues the property is valueless because if it can not be developed as a residential subdivision it will remain vacant, with a value equivalent to that of park land. The fallacy of this approach is that it equates the lack of availability of a property for its most economically valuable use with "valueless." As recognized in the *Lucas* dissent, even when a regulation completely precludes development, a "valueless" finding is implausible. *Lucas,* 505 U.S. at 1076, 112 S.Ct. 2886 (Blackmun, J., dissenting). Although the regulation in *Lucas* precluded the development of ocean-front property, the property still retained value. Property owners could enjoy other attributes of the property: they could picnic, camp in a tent, or live on the property in a mobile trailer. The owners also retained other valuable property rights—the right to exclude others and the right to alienate the land. *Id.* In this case, a jury could reasonably conclude the property retained similar residual uses, and therefore retained some value.

In addition, even if profitability was a determining factor in a *Lucas* analysis, we are aware of no authority, nor has any been provided, to support the proposition that property is valueless simply because it may command a lesser price in an area where values are typically high. Even using the lowest possible value for the undeveloped land, a reasonable jury could conclude land valued at $2,000 per acre has more than "token" value. Appellant's insistence that it is virtually impossible to find a tract of land without value is instructive. The fact that a piece of property will rarely be deemed utterly lacking in economic viability is consistent with the

*Lucas* limitation of such claims to extraordinary circumstances. *Lucas,* at 1017, 112 S.Ct. 2886. With a value of at least $2,000 per acre, we conclude those extraordinary circumstances are not present here. Because the ordinance does not completely eliminate the value of the property, there has been no unconstitutional taking.

*The City's Motive*

Both parties devote considerable attention to the City's motive for the ordinance and whether the area has undergone sufficient urbanization to warrant a change to the zoning. The developer argued at trial the City refused the zoning changes because of its desire to keep the land as a passive park. The developer also introduced evidence the property was included on the City's 1996 Land Plan as a future park site, and the City expressed a desire for a hike and bike trail across the property to connect to an existing park. According to the developer, the fact that 99% of the land remains in its natural state is consistent with the City's alleged intent. The developer also introduced evidence of development of the surrounding area to demonstrate urbanization had occurred by the time the property was purchased.

This evidence, however, is not relevant to a *Lucas* determination. Evidence of this nature might have significance to the determination of whether the ordinance substantially advances a legitimate government interest. As we have noted, however, the substantial interest test was abrogated in *Lingle. See Lingle,* 544 U.S. at 548, 125 S.Ct. 2074. The *Lingle* court held while an inquiry concerning the legitimacy of governmental interests has some logic in a due process context, it has no place in a takings analysis. Instead of probing the regulation's effect on private property, the "substantially advances" test probes the regulation's underlying validity. *Id.* at

542–43, 125 S.Ct. 2074. Consequently, the court held the test inapplicable to an inverse condemnation claim. *See Id.* at 548, 125 S.Ct. 2074; *But see, Sheffield* at 673–74. In light of *Lingle,* the continued validity of the test for purposes of state constitutional law may be the subject of further consideration by the Texas Supreme Court. Because the only issue in this case pertains to a *Lucas* claim, we need not make the determination here.

We resolve the developer's issue against it. Finding no reversible error, we affirm the judgment of the trial court.