LAS COLINAS OBSTETRICS–GYNE-
COLOGY–INFERTILITY ASSO-
CIATION, P.A., Appellant,

v.

Veronica VILLALBA, M.D., Appellee.

No. 05–09–00031–CV.

Court of Appeals of Texas,
Dallas.

Aug. 4, 2010.

Rehearing Overruled Oct. 7, 2010.

Tricia R. Deleon, William J. Moore, Janelle S. Forteza, J. Brett Busby, Bracewell & Giuliani, LLP, Dallas, TX, for Appellant.

David Grant Crooks, Abby L. Ewing, Barry L. Hardin, David, Goodman, Madole, PC, Dallas, TX, for Appellee.

Before Justices MOSELEY, MARTIN RICHTER, and MYERS.

## OPINION

Opinion By Justice MARTIN RICHTER.

Las Colinas Obstetrics–Gynecology–Infertility Association, P.A. (Association) appeals the trial court's judgment in favor of Veronica Villalba, M.D. (Villalba). In three issues, the Association challenges the legal and factual sufficiency of the trial court's findings with respect to Villalba's contractual entitlement to bonus payments, Villalba's breach of contract, and Villalba's breach of fiduciary duty to the Association. We reverse and remand in part, and affirm in part.

## BACKGROUND

In 2002, the Association, a regional medical association providing gynecological and

obstetric services, hired Villalba, a licensed physician, and shortly thereafter the parties memorialized the terms of their employment relationship in an engagement agreement. In 2005, the Association and Villalba modified and extended the engagement letter by letter agreement. Together, the engagement agreement and the letter agreement (collectively, the agreement) governed the parties' contractual obligations and detailed how Villalba would be compensated.

The agreement based Villalba's compensation on the amount collected each month for medical services she performed. Specifically, the agreement provided that the first $15,000 collected per month would be paid to Villalba as compensation, and the next $22,500 would be retained by the Association as overhead attributable to Villalba. For collections attributable to Villalba which exceeded $37,500 on a monthly basis, the agreement stated the excess would first cover any deficits to the Association for any month in which the Association did not receive $22,500 per month. The excess was then subject to adjustments for future malpractice insurance increases and payments made by the Association to cover Villalba's hospital accounts receivable. A spreadsheet attached to the agreement as Exhibit "A" illustrated these calculations. After covering deficits and adjustments, the excess was divided between Villalba and the Association with Villalba receiving seventy percent of the first $10,000 of excess collections and eighty percent of amounts over $10,000 as a bonus. The 2005 letter modifying the agreement extended the term of the agreement, stated that the bonus calculation would remain the same, and provided for a biweekly advance of $1,500 toward the quarterly bonus.

On December 1, 2005, Villalba gave the Association ninety days notice of her resignation as required by the agreement. Upon receiving Villalba's notice of resignation, the Association calculated that bonus amounts already advanced to Villalba exceeded the bonus amounts actually earned. The Association began making deductions from Villalba's compensation to recoup the amounts it believed she was overpaid, withholding the following amounts: $3,500 in December, 2005; $9,000 in January, 2006; and $13,223 in February, 2006. On January 25, 2006, Villalba took a medical leave from the Association. Her last day of employment was February 28, 2006.

In May 2006, Villalba sued the Association and its president, Dr. John J. Zavaleta (Zavaleta), for failing to pay her compensation and bonuses earned before her last day of employment. Villalba claimed the Association failed to promptly bill for services and procedures Villalba performed for a number of her patients. Had the claims been filed timely, Villalba asserted they would have been paid prior to her last day of employment and the amounts paid would have been credited to her for compensation purposes. At the time of trial, Villalba's live pleading also asserted claims that the Association breached the agreement by failing to provide necessary equipment, staff, and support required to perform her duties; interfering with patient billing and submission of claims; refusing to pay her compensation for collections attributable to her but omitted from her compensation calculation; and reducing her salary while she was disabled. Villalba's Fifth Amended Petition also included claims for quantum meruit and violation of the Texas Criminal Wiretap Act and Federal Wiretap Act. The Association and Zavaleta generally denied Villalba's claims and asserted a counterclaim against Villalba for breach of contract by accepting and refusing to return bonuses she had not earned, failing to devote her full time, interest and best ef-

forts to the Association, and failing to maintain patient paperwork. The Association's counterclaim also included a claim that Villalba breached her fiduciary duty and duty of loyalty to the Association by planning and establishing a competing medical practice and soliciting Association patients and employees while still employed by the Association.

At the conclusion of the bench trial, the trial court signed a final judgment awarding Villalba actual damages of $26,517.00 against the Association, together with pre-judgment interest of $3,971.01, and attorneys' fees of $54,500.00. The judgment also ordered that Villalba take nothing from Zavaleta, and the Association take nothing from its counterclaim against Villalba. The trial court issued extensive findings of fact and conclusions of law. The Association filed a motion for new trial which was overruled by operation of law. This appeal followed.

## STANDARD OF REVIEW

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Aland v. Martin*, 271 S.W.3d 424, 428–29 (Tex.App.-Dallas 2008, no pet.); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex.App.-Houston [1st Dist.] 2005, no pet.). When challenged, findings of fact are not conclusive if there is a complete reporter's record. *Aland*, 271 S.W.3d at 429; *HTS Servs.*, 190 S.W.3d at 111. When there is a reporter's record, the trial court's findings of fact are binding only if supported by the evidence. *HTS Servs.*, 190 S.W.3d at 111. We review the sufficiency of the evidence supporting the findings by applying the same standards we use in reviewing the legal and factual sufficiency of the evidence supporting a jury verdict. *Catalina v. Blas-del*, 881 S.W.2d 295, 297 (Tex.1994); *Aland*, 271 S.W.3d at 429.

An appellant challenging the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole would enable reasonable and fair-minded people to differ in their conclusions. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994); *Aland*, 271 S.W.3d at 429. We view the evidence in the light most favorable to the fact-finding, credit favorable evidence if a reasonable fact-finder could do so, and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 888 (Tex.App.-Dallas 2009, no pet.). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998); *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 736 (Tex.App.-Dallas 2007, pet. denied).

To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and set aside the finding only if the evidence supporting it is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Alan Reuber Chevrolet*, 287 S.W.3d at 888. In a bench trial, the trial court judges the credibility of the witnesses, determines the weight to be given to their testimony, and resolves con-

flicts and inconsistencies in the testimony. *See City of Keller,* 168 S.W.3d at 819; *Hinkle v. Hinkle,* 223 S.W.3d 773, 778 (Tex.App.-Dallas 2007). We may not substitute our judgment for the fact-finder's, even though, after reviewing the evidence, we would reach a different conclusion from that of the trier of fact. *Essex Crane Rental Corp. v. Striland Constr. Co., Inc.,* 753 S.W.2d 751, 755 (Tex.App.-Dallas 1988, writ denied.); *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

We review de novo a trial court's conclusions of law. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). If we determine that the trial court made an erroneous conclusion of law, we will not reverse if the trial court rendered the proper judgment. *Id.* We uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Simpson v. Simpson,* 727 S.W.2d 662, 664 (Tex.App.-Dallas 1987, no writ).

**BREACH OF CONTRACT BY THE ASSOCIATION**

The Association's first issue pertains to Villalba's claim that the Association breached the agreement and presents three distinct but related arguments. First, the Association argues the trial court's factual findings with respect to Villalba's bonus calculation and omitted collections were unsupported by legally or factually sufficient evidence. Second, the Association contends the trial court erred in granting judgment in favor of Villalba on her breach of contract claim because the trial court's interpretation of Villalba's bonus calculation in the contract was erroneous. Third, because Villalba did not plead or advocate a challenge to the Association's method of calculating her bonus, the Association asserts it did not have fair notice that the trial court would interpret the contract provisions that set forth the method and formula for calculating Villalba's compensation.

**A. APPLICABLE LAW**

In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam); *Carbona v. CH Medical, Inc.,* 266 S.W.3d 675, 680 (Tex. App.-Dallas 2008, no pet.). We discern intent from the agreement itself and the agreement must be enforced as written. *Deep Nines, Inc. v. McAfee, Inc.,* 246 S.W.3d 842, 846 (Tex.App.-Dallas 2008, no pet.). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank,* 165 S.W.3d at 312; *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n,* 205 S.W.3d 46, 55 (Tex.App.-Dallas 2006, pet. denied).

Whether an agreement is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances existing at the time the contract was entered. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983); *Hackberry Creek Country Club,* 205 S.W.3d at 56. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex. 2006); *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Seagull Energy E & P,* 207 S.W.3d at 345; *Jacobson v. DP Partners Ltd.*

*Partnership*, 245 S.W.3d 102, 106 (Tex. App.-Dallas 2008, no pet.). If the agreement can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and we will construe it as a matter of law. *Coker*, 650 S.W.2d at 393.

Neither the parties nor the trial court found this agreement ambiguous, and we likewise agree that it is not. Its meaning is therefore a question of law. *Coker*, 650 S.W.2d at 394. "The intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written." *Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex.App.-Dallas 2005, no pet.). A court will not change a contract merely because the court or one of the parties comes to dislike its provisions or thinks that something else is needed. *Id.*

### B. Collections

Villalba's compensation was governed by article 3 of the agreement. Article 3, paragraph 7 required the Association, its agents and employees to work together to make sure that all services performed by Villalba were properly credited for purposes of calculating Villalba's bonus. Article 4 provided that upon termination of the agreement, Villalba was entitled to receive only the compensation accrued but unpaid as of the date of the termination. The trial court found that "on occasions in 2005 and the first two months of 2006, the Association and its agents and employees failed to bill responsible parties promptly for services rendered by Dr. Villalba, with the result that Dr. Villalba did not receive proper credit for such services for purposes of calculating her bonuses." The court found that Villalba should be credited with additional collections from nine patients and increased Villalba's collections by $9,660.

The Association challenges the trial court's findings and asserts Villalba did not present legally or factually sufficient evidence to support the validity of the omitted collections.

At trial, Villalba testified that during her first three years of practice, her gross charges and cash collections were consistent but in August or September, 2005, her cash collections began to drastically reduce. She noticed the Association's billing department was submitting her claims late or failing to properly credit her for claims, which ultimately affected her collections. She testified that although she complained to Zavaleta and Kit Williams, the Association's accountant, nothing was done. Villalba explained that after a physician performs a procedure, usually the claim is submitted to insurance or the party responsible for payment within a couple of days. She conceded the Association had no control over how long it took an insurance company to process and pay a claim but in her experience, claims were generally paid within thirty days. Veronica Anderson, the Association's chief operating officer and custodian of records, testified there was no rule within the Association that claims had to be filed within two days or thirty days. The Association just made sure to file claims within ninety days because claims filed over ninety days after service would be denied as untimely.

Villalba testified she was not credited for collections attributable to services she performed for at least eighteen patients because the claims were untimely submitted by the Association to insurance companies, or the services were credited to other doctors within the Association. With respect to the eighteen patients identified by Villalba, she described the services provided, the dates the services were performed, the dates the corresponding invoices were submitted, the amounts charged for such

services, and the dates on which such amounts were paid. Villalba explained that she compiled her list of patients (the omitted collections list) after reviewing explanations of benefits received from insurance companies, surgical reports from the hospital, and patient receipts. She then compared her list with patient posting details produced by the Association.

As custodian of the Association's records, Anderson testified that after reviewing its patient billing records, the Association determined Villalba was entitled to collections credit for three of the patients on her omitted collections list—Hinojosa, Patel, and Paz. The Association did not agree, however, that Villalba was entitled to collections credit for the other fifteen patients on her list, including the six patients for whom the trial court gave credit—Cooper, Shveta, Hernandez, Ceballos, Vijayvargiya, and Jaquez.

At trial, Villalba testified she treated Cooper on August 18, 2005, but the Association submitted the claim late and it was denied. Anderson testified the Association never billed for services to Cooper. With respect to Shveta, Villalba testified she treated her on August 8, 2005. Anderson testified she was unable to tell from the records why the Association did not bill or collect for services to Shveta. Villalba testified she treated Hernandez on November 11, 2005, but the claim for $2,665.93 was not paid until March 1, 2005. Anderson testified that Villalba was not entitled to credit because Hernandez had pelvic reconstruction surgery and only Zavaleta performed that surgery. Anderson further stated that Villalba received credit for assisting Zavaleta with the procedure. Ceballos was treated by Villalba on December 2, 2005, but the claim for $416 was submitted 227 days later. Anderson could not determine when the claim was filed but testified Ceballos used a different doctor

to deliver her baby so the Association did not get paid. With respect to Vijayvargiya, Villalba provided service on November 30, 2005, but the Association's posting details reflected the service date being February 28, 2006. In addition, the service was credited to a different doctor. A claim was ultimately filed on March 11, 2006, and the Association received payment of $1,836.43 on May 26, 2006. Villalba testified she treated Jaquez on December 31, 2005. A claim was submitted 73 days later. Anderson testified that Villalba was not given credit for the payment of $1971 because the claim was paid after Villalba left the Association.

In addition to Villalba, other witnesses testified at trial regarding the Association's collection problems. Palmira Salinas, former accounts manager for the Association, testified that after Villalba submitted her notice of resignation, Zavaleta instructed Salinas to delay filing claims for insurance payments on high cost procedures. She testified that she withheld charges for all of the doctors so it would not look like only Villalba's claims were being held. Salinas further testified that Zavaleta instructed her to not give Villalba access to patient medical and billing records.

Zavaleta testified Villalba came to him once or twice to discuss concerns about the billing department. Although he asked Villalba for specific examples that he could discuss with Salinas, the billing coordinator, Villalba failed to provide him with the information. He denied ever instructing Salinas to hold claims or restrict Villalba's access to the medical and billing records of her patients. However, he testified that he believed Salinas held his claims because she was upset with him. Zavaleta stated that in March 2006, he hired Jacqueline Bailleu, president of JPack Medical Management Solutions, to audit the billing rec-

ords to determine why collections had declined so dramatically. He testified he thought the Association was experiencing a computer problem. With respect to the decrease in Villalba's collections, Zavaleta testified that Villalba inflated the number of surgeries for which she claimed to be the primary surgeon instead of the assistant surgeon. The amount paid to a primary surgeon is significantly higher than the amount paid to an assistant surgeon.

Bailleu testified that in March or April, 2006, Zavaleta hired her to conduct an audit of the Association's computer system to determine why cash flow had dropped significantly in the past quarter. She discovered that from January through March, 2006, a significant number of claims had been intentionally put on hold in the computer and had never been submitted for payment. She was unable to determine who put the claims on hold. She further testified that all of the claims were for patients of Zavaleta. She found no evidence of Villalba's claims being held. She acknowledged that she performed her audit after Villalba left the Association.

As the trier of fact, the trial court judged the credibility of the witnesses, determined the weight to be given to their testimony, and resolved conflicts and inconsistencies in the testimony. The trial court found the Association failed to promptly bill and properly credit Villalba for collections from nine patients—three patients for whom the Association agreed collections should have been credited to Villalba (Hinojosa, Patel, and Paz), and six additional patients from Villalba's list of eighteen (Cooper, Shveta, Hernandez, Ceballos, Vijayvargiya, and Jaquez). The trial court found Villalba failed to sustain her burden of proof with respect to the remaining patients on her omitted collections list. Applying the appropriate standards of review, we conclude legally and factually sufficient evidence exists to support the trial court's findings that the Association failed to properly credit Villalba for services provided to nine patients. We further conclude legally and factually sufficient evidence exists to support the trial court's findings that Villalba's collections should be increased by the amount of $9,660 for such services.

## C. Bonus Calculation

The trial court found, and the parties do not dispute, that article 3 of the contract provided the method and formula for calculating Villalba's compensation, including bonus. On a monthly basis, Villalba was to receive the first $15,000 of cash collections as compensation. The Association was entitled to retain the next $22,500 of cash collections as overhead attributable to Villalba. With respect to Villalba's bonus calculation, the agreement states:

4. For collections attributable to Dr. Villalba which exceed $37,500.00 on a monthly basis, the excess will first go back to cover any deficits to Las Colinas OB/GYN when the Association did not receive $22,500.00 per month.

5. Assuming there is no deficit from prior months, then the excess will be accumulated and divided as follows, subject to the two "Adjustments" which are hereinbelow stated in Subparagraph 8. of this Article 3:

| | VILLALBA | LAS COLINAS OB/GYN |
|---|---|---|
| First $10,000.00 monthly | 70% | 30% |
| Over $10,000.00 | 80% | 20% |

According to article 3, paragraph 8 of the agreement, the "adjustments" referenced above in paragraph 5 include fifty percent of future malpractice increases and payments the Association made to the hospital for Dr. Villalba's accounts receivables. The agreement stated that in order for Villalba to receive a bonus, her average monthly collections had to exceed $37,500

over the term of the agreement. If not, it was possible that a bonus paid quarterly would have to be withheld from future salary. An example of the compensation calculation was attached to the agreement as Exhibit "A"; however, Exhibit "A" did not include examples of the monthly excess bonus calculation described in paragraph 5.

Using the compensation and bonus formula in the contract, the trial court calculated Villalba's compensation and bonus for January 2005 through February 2006 and found that Villalba was owed a bonus of $26,517 on the last day of her employment. The trial court concluded that "Article 3 of the Contract did not provide for the accrual of 'negative bonus' amounts in months when Dr. Villalba's collections were less than $37,500, but only allowed such deficits to be deducted from future surplus collections before Dr. Villalba was entitled to additional bonuses."

The Association challenges the trial court's conclusion of law as legally incorrect, and the findings of fact supporting the conclusion, based upon the court's interpretation of the contract, as unsupported by legally or factually sufficient evidence. In support of its argument that the contract provides for accrual of negative bonus amounts, the Association points to several terms of the contract that required negative bonus adjustments, such as the negative adjustment to cover overhead deficits for prior months and the negative adjustments to monthly excess collections for malpractice insurance increases and hospital accounts receivable. We acknowledge the contract expressly authorizes such negative adjustments. However, the Association attempts to persuade us that article 3, paragraph 5 con-

templates a negative bonus percentage calculation for those months in which there is no excess to be divided between Villalba and the Association.

The Association, Villalba, and the trial court each prepared a spreadsheet reflecting Villalba's compensation and bonus calculations. All three spreadsheets used the same numbers for Villalba's charges, collections, salary and overhead.[1] All three spreadsheets made negative adjustments to cover malpractice insurance increases and hospital accounts receivables. All three spreadsheets used the same methodology to arrive at amounts in the monthly bonus pool and the cumulative bonus pool. The monthly bonus pool amount was determined by subtracting compensation, overhead, malpractice insurance increases and hospital accounts receivables from Villalba's monthly collections. The cumulative bonus pool amount was a running total of monthly bonus pool amounts for the term of the agreement. In months when Villalba's monthly bonus pool was a positive number, all three spreadsheets added that positive amount to the cumulative bonus pool. Likewise, in months when Villalba's monthly bonus pool was a negative number, all three spreadsheets subtracted that negative amount from the cumulative bonus pool.

The significant difference between the spreadsheets occurred in calculating bonus percentages, specifically in months when Villalba's monthly bonus pool was a negative number. For those months, based on its interpretation of article 3, paragraph 5 of the agreement, the trial court did not calculate a bonus percentage. The Association and Villalba, on the other hand, calculated a bonus percentage on the negative amount and subtracted it from amount of

1. The three spreadsheets added differing amounts of "omitted collections" as discussed above. Therefore, the amount of monthly collections on the three spreadsheets reflected these differences.

total bonus to be paid to Villalba. After examining the agreement as a whole to determine the intent of the parties, we conclude the trial court properly interpreted article 3, paragraph 5 of the agreement with respect to months in which there was no excess. The plain language of the agreement provides for a bonus percentage calculation when there is an excess. The contract does not state the bonus percentage shall be calculated on a monthly basis regardless of whether there is an excess or a deficit. Although other negative adjustments in this article are expressly stated, the agreement is silent with respect to the calculation of bonus percentages when the monthly bonus pool is a negative amount. Therefore, we conclude the agreement as written does not provide for negative bonus percentage calculations.

■ Although we conclude the trial court utilized the correct methodology, we conclude the trial court's calculations were erroneous. The bonus calculation in article 3, paragraph 5 is conditioned upon there being no deficits in prior months. According to article 3, paragraph 4, "for collections attributable to Dr. Villalba which exceed $37,500 on a monthly basis, the excess will first go back to cover any deficits to Las Colinas OB/GYN when the Association did not receive $22,500 per month." In May 2005, July 2005, January 2006, and February 2006, Villalba's monthly bonus pool contained an excess. However, for each month there were deficits from prior months in which the Association did not receive $22,500 per month and the malpractice insurance and hospital receivables adjustments were not made. The trial court failed to first deduct amounts necessary to cover deficits for prior months before calculating the bonus percentage. Consequently, bonus amounts calculated for those months are incorrect. Because the monthly bonus calculations

affect the total bonus amount to be paid to Villalba, we remand to the trial court for recalculation of Villalba's bonus in accordance with this opinion.

### D. FAIR NOTICE

■ The Association contends it is entitled to a new trial because the trial court's judgment did not conform to the pleadings. *See* TEX.R. CIV. P. 301. The Association asserts that because Villalba did not plead that the bonus formula applied by the Association was incorrect, the Association did not have fair notice that the trial court would find that a negative bonus adjustment was not proper under the agreement. The Association does not dispute that both parties claimed a breach of article 3 of the agreement, but argues that both did so pursuant to the Association's interpretation of that article.

■ A trial court's judgment must conform to the pleadings. TEX.R. CIV. P. 301. The petition must give fair and adequate notice of the claims asserted. *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 354–55 (Tex.1995); *Moneyhon v. Moneyhon,* 278 S.W.3d 874, 878 (Tex. App.-Houston [14th Dist.] 2009, no pet.). We liberally construe the petition to contain any claims that reasonably may be inferred from the specific language used in the petition and uphold the petition as to those claims, even if an element of a claim is not specifically alleged. *SmithKline Beecham,* 903 S.W.2d at 354. Villalba's petition alleged she was entitled to damages based on the Association's breach of article 3 in withholding Villalba's salary and bonus. Interpretation of a contract is a question of law for the court. *See Coker,* 650 S.W.2d at 394. Notwithstanding the Association's argument that the trial court should have used the Association's interpretation of the bonus formula, it is well established that the intent of the parties to

a unambiguous contract must be taken from the agreement itself and not from the parties' interpretation. *See Coker*, 650 S.W.2d at 393; *Calpine Producer Servs.*, 169 S.W.3d at 787. We conclude the Association had fair and adequate notice that the trial court would be construing the agreement between the parties with particular attention on the provisions addressing Villalba's compensation and bonus.

## BREACH OF CONTRACT BY VILLALBA

In its second issue, the Association asserts the trial court erred in finding Villalba did not breach the contract by failing to pay back unearned bonus advances. At trial, the Association argued Villalba failed to pay back unearned bonus advances in the amount of $3,367. We conclude the trial court did not err in finding Villalba did not owe the Association for unearned bonus amounts. Even though we reverse for recalculation of Villalba's bonus, the additional collections credited to Villalba and the trial court's methodology for calculating Villalba's bonus result in bonus amounts owed to Villalba by the Association. We resolve the second issue against the Association.

## BREACH OF FIDUCIARY DUTY BY VILLALBA

In its third issue, the Association argues the trial court erred in finding the Association failed to prove Villalba liable for breach of contract and breach of fiduciary duty. In its counterclaim against Villalba, the Association asserted she breached the agreement and her fiduciary duty to the Association by establishing a competing medical practice, soliciting employees, and soliciting clients while still employed by the Association.

To prove its claim for breach of contract, the Association was required to establish a valid contract, the Association performed or tendered performance, Villalba breached the contract, and the Association was damaged as a result of Villalba's breach. *See Hackberry Creek Country Club*, 205 S.W.3d at 55. To prove its claim for breach of fiduciary duty, the Association was required to prove the existence of a fiduciary duty, breach of the duty, causation, and damages. *Abetter Trucking Co., Inc. v. Arizpe*, 113 S.W.3d 503, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001); *Phan v. Addison Spectrum, L.P.*, 244 S.W.3d 892, 897 (Tex.App.-Dallas 2008, no pet.); *Rowlett/2000, Ltd. v. City of Rowlett*, 231 S.W.3d 587, 590 (Tex.App.-Dallas 2007, no pet.). In reviewing a "matter of law" challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem.*, 46 S.W.3d at 241; *Phan*, 244 S.W.3d at 898. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem.*, 46 S.W.3d at 241. We find error only if the contrary proposition is conclusively established. *Id.; Phan*, 244 S.W.3d at 898. Here, the Association had the burden of proof on its breach of contract and breach of fiduciary duty claims.

On September 18, 2008, Villalba filed a motion pursuant to rule 193.6 of the Texas Rules of Civil Procedure, seeking to exclude all evidence on damages in support of the Association's claim for breach of contract in excess of the amount of $515

(the amount of bonus the Association claimed Villalba was overpaid and should pay back). In her motion, Villalba asserted the Association failed to disclose the amount and method of calculating its damages for its claim against her for breach of contract in excess of $515. At the pretrial hearing, the trial court heard arguments from both parties on Villalba's motion to exclude, and based on rule 193.6, sustained Villalba's objection to the Association's evidence. Tex.R. Civ. P. 193.6(a). In its order, signed September 18, 2008, the trial court ordered the Association to refrain from any mention of "evidence on damages in support of Defendants' claim for breach of contract in excess of the amount of $515.00 (for failing to disclose the amount and method of calculating same)." On September 22, 2008, Villalba filed a supplemental motion, expanding her description of evidence to be excluded due to the Association's failure to timely disclose the amount and method of calculating damages to include any evidence in support of damages asserted by the Association on its breach of fiduciary duty and breach of loyalty claims. According to the record, the trial court did not rule on the supplemental motion but informed the parties it would consider objections to such evidence at the time they arose during the course of trial. During the trial, the trial court sustained objections to the admissibility of evidence regarding damages on the Association's breach of contract and breach of fiduciary duty claims.

Since the record contains no evidence of damages in support of the Association's claim for breach of contract and breach of fiduciary duty, we conclude the trial court did not err in finding the Association failed to prove Villalba was liable for breach of contract (in excess of the amount of $515 claimed as unearned bonuses) or breach of fiduciary duty. *Dow Chemical,* 46 S.W.3d at 242. The Association's third issue is resolved against it.

### CONCLUSION

We affirm in part and reverse in part. We affirm the judgment of the trial court as to Villalba's omitted collections, the trial court's interpretation of the compensation provisions of the agreement, Villalba's breach of the agreement, and Villalba's breach of fiduciary duty. We reverse in part and remand for recalculation of Villalba's bonus.