Judgment Affirmed; Order Affirmed as Modified, and Opinion
filed May 3, 2011.



 



In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00701-CV



 

The City of Houston, Appellant

V.

Maguire Oil Company, MAGUIRE
ENERGY COMPANY, CARY M. MAGUIRE, CARY M. MAGUIRE AS MANAGER FOR THE OIL FUND
U/I/D 9/1/76, CARY M. MAGUIRE AS TRUSTEE UTD 1/1/83 FBO CARY M. MAGUIRE, JR.,
CARY M. MAGUIRE AS TRUSTEE UTD 1/1/83 FBO MELINDA AMBLER MAGUIRE, CARY M.
MAGUIRE AS TRUSTEE UTD 5/1/84 FBO ANN BLAINE MAGUIRE, DON R. HOLLOWAY AS
CUSTODIAN OF THE W. MATTHEW HOLLOWAY TUGTMA, DON R. HOLLOWAY AS CUSTODIAN OF
THE SARAH L. HOLLOWAY TUGTMA, DON R. HOLLOWAY AS CUSTODIAN OF THE BARBARA ANN
HOLLOWAY TUGTMA, DON R. HOLLOWAY AS CUSTODIAN OF THE TILLMAN R. HOLLOWAY TUGTMA,
WILLIAM N. COLLINS, JR., AS CUSTODIAN OF THE L. PAIGE COLLINS TUGTMA, WILLIAM
N. COLLINS, JR., AS CUSTODIAN OF THE HATTIE S. COLLINS TUGTMA, and WILLIAM N. COLLINS,
JR., AS CUSTODIAN OF THE CHANDLER COLLINS TUGTMA, Appellees

 



On Appeal from the County Civil
Court at Law No. 4

Harris County, Texas

Trial Court Cause No. 817,512



 

 

OPINION

 

The City of Houston appeals from a judgment in favor
of Maguire Oil Company and others[1]
arising from an inverse condemnation claim predicated on the erroneous
invocation of an inapplicable city ordinance to revoke Maguire’s natural gas drilling
permit.  We affirm the trial court’s judgment.

Background

The fight over Maguire’s thwarted effort to drill for
natural gas near Lake Houston is poised to mark its twentieth anniversary.  This
dispute encompasses one drilling site, two trials, three trial courts, four appeals,[2]
and five Houston mayors.  

I.                  
Factual Background

The City acquired surface rights to land in the 1940s
that eventually was inundated to create Lake Houston.  The City adopted an
ordinance in 1965 that generally proscribed pollution in the “control area” of
Lake Houston.  The City amended the ordinance in 1967 to restrict drilling in the
Lake Houston “control area.”  The term “control area” is significant to this
litigation.

“Control area” was defined in the 1965 ordinance as
“[t]hat land around the Lake within an area five (5) miles in width measured
from the Normal Water’s Edge of, and within the watershed of, Lake Houston.”  The
City Council amended the definition of “control area” in 1977 to equate that
term with the City’s “extraterritorial jurisdiction.”  The shifting definition
of “control area” later played a key role in the dispute.  Although the
definition was amended again in 1997 to expand the scope of the “control area,”
the 1977 definition governs this dispute. 

 

Between 1953 and 1991, Maguire acquired oil and gas
leases covering five tracts near Lake Houston known collectively as the “Scanlan
Deep Prospect.”  The leases encompassing the Scanlan Deep Prospect are
identified as the Scanlan, Wheless, Charpiot, Johnston, and Deussen leases.  

Maguire began to investigate drilling a gas well in
the Scanlan Deep Prospect in the late 1980s.  Maguire initially drilled outside
the city limits.  After the failure of a vertical well, described as the
Scanlan Deep No. 1, Maguire attempted to drill directionally.  This attempt
also failed.  These efforts cost several million dollars. 

Maguire then decided to drill a vertical well named
the Wheless No. 1 inside the city limits approximately 300 feet west of Lake
Houston.  Maguire filed appropriate documents and asked the City to issue a
drilling permit in 1991.  The City approved a permit on May 7, 1991 to drill at
the chosen location.  The City later ratified and extended the permit.  Maguire
spent at least $250,000 in preparation for drilling; it cleared the location,
built dikes, built roads, and signed a drilling contract. 

A Lake Houston patrol noticed Maguire’s drilling site
in October 1991 and contacted Richard Alexander, an inspector with the City’s
Public Works and Engineering Water Quality Control Department.  Alexander
inspected the site and determined that it was approximately 300 feet from the
water’s edge of Lake Houston.  Alexander informed his supervisor, Senior
Inspector Henry Aghedo, about the location of Maguire’s drilling site.  Alexander
also contacted Milton Belveal, senior inspector with the Planning and
Development Department, who acknowledged that a permit had been issued to
Maguire.   

Aghedo consulted with his superior, Roger Hulbert, who
was the deputy assistant director of the Public Works and Engineering Water
Quality Control Department.  Hulbert believed Maguire’s permit had been issued
in error and that drilling had to be stopped.  Hulbert therefore instructed
Alexander to issue a stop work order.  

On October 31, 1991, Alexander issued a stop work
order pursuant to City of Houston Code of Ordinances Chapter 23, Article IV
section 23-102, and delivered the order to Maguire’s drilling site.  Section
23-102 states as follows:  “No well shall be drilled within the control area of
Lake Houston which is nearer than 1,000 feet from the normal water’s edge of
Lake Houston or any of its drains, streams or tributaries.”  

That same day, the City also wrote Maguire a letter
stating that its drilling permit had been issued in error and was being revoked
immediately because City of Houston Code of Ordinances sections 23-101 and
23-102 prohibit wells within 1,000 feet from Lake Houston.  The letter was
drafted by Donna Kristaponis, director of the Planning and Development
Department, and stated as follows:

This [sic] to inform you that the above referenced permit
appears to have been issued in error and is revoked effective immediately.  All
work in connection with the drilling of this well must cease immediately. 
Failure to cease operations will result in the issuance of a citation for each
day of continued operations.

City of Houston Code of Ordinances Sections 23-101 and
23-102 prohibit wells from being drilled within 1000 feet from the normal
water’s edge of Lake Houston.  It appears that the entire 40 acre Wheless No. 1
site is within the 1000' setback requirement and, therefore, no wells may be
drilled on it.

I apologize for any inconvenience this may have
caused you.  

Maguire’s original permit
application was processed by Gloria Minor and approved by Hal Caton, Minor’s
supervisor in the Planning and Development Department.  Maguire’s renewal
application was processed by Belveal and approved by Caton.  Before October 31,
1991, Minor and Belveal were not aware of the provisions in chapter 23 of the
City of Houston Code of Ordinances restricting the drilling of wells near Lake
Houston.  Kristaponis and Caton handled the revocation of Maguire’s drilling
permit, and Belveal was told that the permit had been revoked because the well
would be drilled too close to Lake Houston.

Maguire met to discuss the permit revocation with the
Legal, Health, and Planning and Development departments; Maguire also met with
the deputy assistant director of the Public Works and Engineering Water Quality
Control Department.  No resolution was reached.  All of the City’s
representatives maintained that the ordinance prohibited drilling within 1,000
feet of Lake Houston, and that no department would issue a permit that did not
comport with the ordinance.  Deputy Assistant Director Hulbert steadfastly
maintained that his department would not issue a drilling permit.  Maguire attempted
to communicate with the mayor, but these efforts failed.  

II.              
Procedural Background

On October 27, 1993, Maguire sued the City in the
55th District Court of Harris County for damages and a declaratory judgment.  Maguire
alleged that “certain actions taken by the City against mineral interests
[Maguire] owned near Lake Houston amounted to, inter alia, (1) a taking
without adequate compensation or due process of law; and (2) unreasonable
discrimination against a mineral property owner.”  Maguire Oil Co. v. City
of Houston, 143 F.3d 205, 206 (5th Cir. 1998).[3] 
Maguire also asserted claims for negligent misrepresentation, estoppel, and promissory
estoppel against the City.  Id.  

The City removed the case to the United States
District Court for the Southern District of Texas on federal question grounds. 
Id.  After a jury returned a verdict in favor of the City, the federal
district court  determined that it lacked subject matter jurisdiction; remanded
the case; and imposed $98,578.10 in sanctions because the City “wrongfully
caused the removal of this case from state court to federal court and,
thereafter, deliberately concealed from the Court and counsel information
pertinent to this Court’s jurisdiction, all of which caused a multiplication of
proceedings and the needless duplication of time and expense.”  Id. at
207-08.  The City appealed the federal district court’s sanctions order.  Id.
at 206.  The Fifth Circuit held that the district court abused its discretion
by imposing sanctions, and reversed the district court’s sanctions order.  Id.
at 212.  

A.        Maguire I

Following remand to the 55th District Court of Harris
County, the City and Maguire filed summary judgment motions.  Maguire Oil
Co. v. City of Houston, 69 S.W.3d 350, 356 (Tex. App.—Texarkana 2002, pet.
denied) (“Maguire I”).  The trial court granted the City’s motions for
summary judgment.  Id. at 356-57.  Maguire appealed the trial court’s
judgment; its appeal was heard by the Texarkana Court of Appeals.  

In Maguire I, the court of appeals held that
summary judgment was proper on Maguire’s negligent misrepresentation claim but improper
as to Maguire’s claims for inverse condemnation, reliance damages based on
promissory estoppel, and selective enforcement.  Id. at 372.  Therefore,
the court affirmed the trial court’s judgment in part, reversed in part, and
remanded the case for further proceedings in the trial court.  Id. 

In so doing, the Texarkana Court of Appeals rejected
the City’s argument that Maguire’s inverse condemnation claim was barred by the
statute of limitations.  The City contended that the limitations bar applied because
(1) section 23-102 was enacted in 1967; and (2) Maguire was required to file
any inverse condemnation action within ten years of its enactment.  Id.
at 358.  The court concluded that Maguire’s inverse condemnation claim was not
barred by the statute of limitations because section 23-102 did not apply to
Maguire’s drill site in 1991.  Id. 359-60.  

The court stated that the 1967 ordinance prohibited
drilling wells “within ‘the control area of Lake Houston which is nearer than
1000 feet from the normal water level of Lake Houston.’”  Id. at 358-59. 
It further noted that the term “control area” first was defined in the 1965
ordinance as “‘[t]he land around the Lake within an area of five (5) miles in
width measured from the Normal Water’s Edge of, and within the watershed of,
Lake Houston.”’  Id. at 359.  But the governing 1977 version of the ordinance
redefined the “control area” as “[t]hat land contained in the extraterritorial
jurisdiction of the City of Houston, Texas, which contains waters that flow
into or adjacent to the watershed Lake Houston.”’  Id.  The court
concluded that the governing 1977 version of the City’s ordinance did not apply
to Maguire’s lease because that lease was within the City limits rather than
the City’s extraterritorial jurisdiction.  Id. 

B.        Maguire II

Following remand to the district court in Maguire
I, Maguire re-filed its inverse condemnation claim in the County Civil
Court at Law Number Four.  Maguire Oil Co. v. City of Houston, 243
S.W.3d 714, 718 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (“Maguire
II”).[4] 
Maguire and the City again filed motions for summary judgment.  Id.  

Among its grounds for summary judgment, the City
urged that Maguire’s takings claim was not ripe.  Id.  The trial court
asked the City to restyle its ripeness challenge as a plea to the jurisdiction
and requested briefs.  Id.  The trial court granted the City’s plea to
the jurisdiction and dismissed Maguire’s case on November 29, 2005.  Id.
 

On appeal, the City contended that Maguire failed to obtain
an appealable final decision because it did not pursue an appeal to the City
Council and did not seek a proper remedy.  Id. at 719.  Maguire argued
that it obtained a final decision, and that any further administrative appeals would
have been futile.  Id.  This court determined that Maguire’s claims were
ripe for adjudication, reversed the trial court’s judgment, and remanded the
case for further proceedings.  Id. at 722.

Maguire II reaffirmed Maguire I’s
holding that section 23-102 did not apply to Maguire’s drilling site in 1991
even though it became later applicable when the ordinance’s definition of
“control area” was amended again in 1997.  See id. at 718 n.1.  This
court determined that the dispute between the City and Maguire was ripe for
adjudication because a final decision had been rendered by the proper
governmental decision-maker designated under the applicable ordinances, and
that any further action on Maguire’s part would have been futile.  Id.
at 722.

We determined the identity of the final decision-maker
as a question of law, and not as a question of fact, based on interpretation of
Chapter 23, Article IV, sections 23-101(2) and 23-104.  See id. at
719.  We concluded that “the director is the only person with authority to
grant a drilling permit,” and the director “is the relevant decision maker.”  Id. 
Section 23-101(2) of Article IV, entitled “Water Supply Protection,” defines “director”
as “[t]he director of public utilities of the city or such other city
department head or official having supervision of Lake Houston and other
surface water supply facilities of the city.”  This definition encompassed Deputy
Assistant Director Hulbert of the Public Works and Engineering Water Quality
Control Department, who instructed Alexander to deliver a stop work order on
October 31, 1991 to Maguire’s drilling site; it also encompassed Director
Kristaponis of the Planning and Development Department, who wrote a follow-up
letter announcing the revocation of Maguire’s drilling permit.  

There is no factual dispute concerning the specific actions
undertaken by the deputy assistant director of public works and engineering, by
the director of planning and development, and by their subordinates.  “Maguire
received a final decision from the relevant decision maker.”  Id. at
719.  This court rejected the City’s argument that an appeal to the City
Council is a prerequisite to a final decision.  Id. at 720.  It further rejected
the City’s contention that “Maguire should have sought a writ of mandamus or
injunction to force the City to issue the permit in light of Maguire’s
contention that section 23-102 did not apply to the proposed drill site.”  Id.
at 721.  In that regard, this court noted that the Texas Supreme Court has “never
held that a landowner must seek an injunction or writ of mandamus before
proceeding with an action for inverse condemnation.”  Id.  

C.        The Trial

After the Texas Supreme Court denied the City’s
petition for review in Maguire II, the case proceeded to trial in the
County Civil Court at Law Number Four on March 16, 2009.

Maguire pleaded four separate taking theories in the
trial court.  In a single trial, the City and Maguire presented evidence
relating to (1) the legal question concerning whether there had been a taking
of Maguire’s mineral property interests; and (2) the fact question concerning damages
for such a taking.  At the conclusion of the evidence, the City and Maguire
agreed that Maguire’s inverse condemnation claim presented a question of law
for the trial court to decide.  The trial court heard arguments from both sides
on the takings claim and ruled as a matter of law that Maguire suffered a
compensable regulatory taking “[b]ased on the City of Houston’s unreasonable
interference with the landowner’s right to use and enjoy its property and on
that theory of law.”  

The trial court then submitted the damages issue to
the jury.  The jury was asked:  “What is the difference, if any, between the fair
market value of PLAINTIFFS’ mineral estate at issue in this case immediately
before and immediately after the revocation of the drilling permit by the
DEFENDANT on October 31, 1991?”  The jury returned a unanimous verdict in
response to this question awarding Maguire $2 million in damages.  

The trial court heard the City’s motion for
reconsideration of the court’s finding of a taking on May 1, 2009.  On that
same day, the trial court signed a final judgment stating that “Plaintiffs have
proved, and the Court finds as a matter of law, that Plaintiffs suffered a
compensable taking of their mineral interests by the City of Houston on October
31, 1991.”  The trial court awarded $2 million in damages in conformity with
the jury’s verdict.

            The trial court signed
findings of fact and conclusions of law on June 24, 2009.  In pertinent part,
the findings of fact and conclusions of law provide as follows.

Findings of Fact

5. On October 31, 1991, Section 23-102 (the “Ordinance”) of
the City’s Code of Ordinances provided: “No well shall be drilled within the
control area of Lake Houston which is nearer than 1,000 feet from the normal
water level of Lake Houston or any of its drains, streams or tributaries”
(referred to herein as the “Prohibited Area”).  This is the same language that
was used in 1967 when the Ordinance was first adopted.  On October 31, 1991,
the term “control area” was defined as: “That land contained in the extraterritorial
jurisdiction of the City of Houston, Texas, which contains waters that flow
into or adjacent to the watershed of Lake Houston.”  This had been the
definition of “control area” since 1977.

*                                  *                                  *

7. On October 31, 1991, Richard Alexander, a City employee,
issued a stop work order directing Maguire to cease drilling operations on the
Wheless No. 1 Well.  That same day, Donna Kristaponis, another City employee,
sent a letter to Maguire, stating that the drilling permit on the Wheless No. 1
Well had been issued in error and was revoked immediately.

8. Erroneously believing the Ordinance applied to the
surface location for the Wheless No. 1 Well, Ms. Kristaponis sought to prevent
drilling operations from that surface location when she issued the letter
revoking the permit for the Wheless No. 1 Well.  Likewise, erroneously
believing the Ordinance applied to the surface location for the Wheless No. 1
Well, Mr. Alexander sought to prevent drilling operations from that surface
location when he issued the stop work order on the Wheless No. 1 Well.

9. Both the stop work order issued by Mr. Alexander and the
letter sent by Ms. Kristaponis were issued to enforce the Ordinance, which they
erroneously believed prohibited the drilling of an oil or gas well from the
approved surface location for the Wheless No. 1 Well, and thereby to protect
the water of Lake Houston, which is a source of drinking water for the City. 
Neither Ms. Kristaponis nor Mr. Alexander intentionally sought to acquire an
interest in or to damage any minerals located in the Scanlan Deep Prospect or
to prevent the recovery of any such minerals through a directional well drilled
from a surface location outside what they understood to be the Prohibited Area.

Conclusions of
Law

1. On October 31, 1991, the Ordinance did not apply to
wells drilled within Houston’s city limits, such as Maguire’s proposed Wheless
No. 1 Well.  As of that date, the Ordinance limited the 1,000-foot drilling
restriction to wells drilled within the City’s “extraterritorial
jurisdiction.”  Maguire Oil Co. v. City of Houston, 243 S.W.3d 714, 718
(Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing Maguire Oil Co.
v. City of Houston, 69 S.W.3d 350 (Tex. App.—Texarkana 2004, pet. denied)).

2. Ms. Kristaponis’ revocation of the drilling permit on
October 31, 1991, and Mr. Alexander’s issuance of the stop work order on
October 31, 1991, were not authorized by the Ordinance. Maguire thus has
suffered a regulatory taking of its mineral interests in violation of Article 1,
Sections 17 and 19 of the Texas Constitution, because the City has unreasonably
interfered with Maguire’s right to use and enjoy its property by preventing
drilling at the surface location covered by the drilling permit.  See
Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660, 672 (Tex.
2004).

In two issues, the City asks
this Court to reverse the trial court’s judgment in favor of Maguire and render
judgment in favor of the City.  

Seizing on the trial court’s determination that the
1991 permit revocation and stop work order “were not authorized by the
Ordinance,” the City contends that a take-nothing judgment is warranted because
(1) “unauthorized acts of a government employee do not result in a ‘taking’ of
property by the governmental entity for which the employee works;” and (2) “the
City did not intend to take Appellees’ mineral interests for public use” by enacting
an ordinance that did not apply to Maguire’s well, regardless of whether the
ordinance was in fact invoked erroneously to preclude drilling.

Standard and Scope of Review

            Determining
whether an ordinance accomplishes a regulatory taking for which compensation is
required involves the consideration of subsidiary factors, fact determinations,
and all surrounding circumstances.  Sheffield Dev. Co. v. City of Glenn
Heights, 140 S.W.3d 660, 672-73 (Tex. 2004); Mayhew v. Town of Sunnyvale,
964 S.W.2d 922, 932 (Tex. 1998); Rowlett/2000, Ltd. v. City of Rowlett,
231 S.W.3d 587, 590 (Tex. App.—Dallas 2007, no pet).  While we depend on the
trial court to resolve disputed facts regarding the extent of the governmental
intrusion on the property, the ultimate determination of whether a taking has
occurred is treated as a question of law.  Sheffield, 140 S.W.3d at 673;
Mayhew, 964 S.W.2d at 933; Rowlett/2000, 231 S.W.3d at 590.  We
review this question of law de novo.  Alewine v. City of Houston,
309 S.W.3d 771, 775 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Analysis

The Just Compensation Clause of the Fifth Amendment
states, “[N]or shall private property be taken for public use, without just
compensation.”  U.S. Const. amend.
V; Mayhew, 964 S.W.2d at 933.  Article I, section 17 of the Texas
Constitution similarly provides in pertinent part that no “person’s property
shall be taken, damaged or destroyed for or applied to public use without
adequate compensation being made . . . .”  Tex. Const. art. I, § 17; Mayhew,
964 S.W.2d at 933.  “At the heart of the takings clause lies the premise that
the government should not ‘forc[e] some people alone to bear public burdens
which, in all fairness and justice, should be borne by the public as a
whole.”’  Tarrant Reg’l Water Dist. v. Gragg, 151 S.W.3d 546, 554 (Tex.
2004) (quoting Steele v. City of Houston, 603 S.W.2d 786, 789 (Tex.
1980)).  

Takings can be classified as physical or regulatory.  Mayhew,
964 S.W.2d at 933.  Because “there are several sharp distinctions between
physical takings and regulatory takings,” it is “often inappropriate to treat
cases involving one as controlling precedents for the other.”  Lowenberg v.
City of Dallas, 168 S.W.3d 800, 801-02 (Tex. 2005) (citing Tahoe-Sierra
Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 535 U.S. 302, 323-24
(2002)).  

Physical takings occur when the government authorizes
an unwarranted physical occupation of an individual’s property.  Mayhew,
964 S.W.2d at 933.  Physical possession is, categorically, a taking for which
compensation is constitutionally mandated.  Sheffield, 140 S.W.3d at
669-70.

In contrast to a physical taking, a restriction on
the permissible uses of property or a diminution in its value resulting from
regulatory action within the government’s police power may or may not be a
compensable taking depending on the circumstances.  Id.  ‘“[A]ll
property is held subject to the valid exercise of the police power’ and thus
not every regulation is a compensable taking, although some are.”  Id.
at 670 (quoting City of College Station v. Turtle Rock Corp., 680 S.W.2d
802, 804 (Tex. 1984)). 

A plaintiff potentially may invoke multiple distinct
theories in challenging a government regulation as an unconstitutional taking.  The
plaintiff may assert (1) a physical taking, which occurs when regulatory action
requires an owner to suffer physical invasion of his property;[5]
(2) a Lucas-type total regulatory taking, which occurs when regulatory
action completely deprives an owner of all economically beneficial use of his
property;[6]
(3) a Penn Central taking, which occurs when regulatory action
unreasonably interferes with a property owner’s right to use and enjoy his
property;[7]
or (4) a land-use exaction, which occurs when the government requires an owner
to give up his right to just compensation for property taken in exchange for a
discretionary benefit conferred by the government.[8] 
Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 548 (2005); see
Sheffield, 140 S.W.3d at 671-72. 

In this appeal, Maguire’s claim rests primarily on its
contention that the City’s enforcement of an inapplicable ordinance to preclude
drilling near Lake Houston unreasonably interfered with Maguire’s right to use
and enjoy its mineral estate.  Maguire thus contends that compensation is
warranted as a regulatory taking under the three factors identified in Penn
Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978), and Sheffield,
140 S.W.3d at 671-72.  As in Sheffield, Maguire does not assert a
separate claim under the Takings Clause of the Fifth Amendment to the United
States Constitution.  Maguire invoked only Article I, Sections 17 and 19 of the
Texas Constitution in its pleadings.  Maguire does not contend that wording
differences between the federal Takings Clause and the Texas Constitution
affect the analysis in this case.  Therefore, in applying the relevant Texas constitutional
provision to the circumstances of this case, we look to federal takings
jurisprudence for guidance.  See Sheffield, 140 S.W.3d at 669.

We do not apply the factors identified in Penn
Central and Sheffield in cookbook fashion when determining whether a
regulatory taking has occurred.  See id. at 672-73.  Such a
determination depends heavily on the individual context and surrounding
circumstances.  Id.  “‘Penn Central does not supply
mathematically precise variables, but instead provides important guideposts that
lead to the ultimate determination whether just compensation is required.’”  Tahoe-Sierra
Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 535 U.S. 302, 326-27
n.23 (2002) (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 634
(2001)).  “‘The temptation to adopt what amount to per se rules in either
direction must be resisted.’”  Id. (quoting Palazzolo, 533 U.S.
at 636); see also Sheffield, 140 S.W.3d at 672.

I.                  
Which Takings Theory is the Judgment Predicated Upon?

We first consider which takings theory or theories
the trial court relied upon in fashioning its judgment in favor of Maguire. 
The City contends that the trial court’s findings of fact and conclusions of
law establish only a single basis for the judgment.  Maguire contends that the
judgment can be affirmed based on any of four separate takings theories pleaded
in the trial court.

Maguire pleaded four separate takings theories in the
trial court: (1) a physical taking, see Gragg, 151 S.W.3d at 554;
(2) a regulatory taking by the denial of all economically viable use of its
mineral estate, see Mayhew, 964 S.W.2d at 933; (3) a regulatory
taking based on unreasonable interference with Maguire’s right to use and enjoy
its property under the factors identified in Penn Central, 438 U.S. at
124, and Sheffield, 140 S.W.3d 660; and (4) denial of access to its
mineral estate, see Tarrant Cnty. Water Control & Improvement
Dist. No. One v. Haupt, Inc., 854 S.W.2d 909, 912 (Tex. 1993).

The trial court held that Maguire suffered a
compensable regulatory taking “[b]ased on the City of Houston’s unreasonable
interference with the landowner’s right to use and enjoy its property and on
that theory of law.”  At the May 1, 2009 hearing on the City’s motion for
reconsideration, the trial court stated: “I believe I was pretty clear on the
record . . . and pretty narrow, was I not, on the basis for my finding of the
taking?”  And the City’s counsel responded, “Yes, you were, Your Honor.  It was
based upon the Penn Central line of cases that are noted by and adopted
by the Texas Supreme Court in City of Sunnyvale vs. Mayhew.”

Maguire submitted proposed findings of fact and
conclusions of law encompassing all four of its pleaded takings theories.  The
trial court did not sign Maguire’s proposed findings of fact and conclusions of
law.  Instead, the trial court concluded that Maguire “has suffered a
regulatory taking of its mineral interests . . . because the City has
unreasonably interfered with Maguire’s right to use and enjoy its property by
preventing drilling.”  The trial court expressly cited Sheffield, 140
S.W.3d at 672.  The cited portion of Sheffield addresses only a
regulatory taking focusing on the factors identified in Penn Central for
identifying when a regulation constitutes a taking in light of its economic
impact on the claimant; the extent to which it has interfered with distinct
investment-backed expectations; and the character of the government action.  See
id.  The trial court made no findings or conclusions pertaining to the alternative
theories Maguire pleaded and submitted in its proposed findings of fact and
conclusions of law.  Nor did the court cite Mayhew, Haupt, or Gragg.

The trial court clearly adopted only one theory based
on unreasonable interference under the factors identified in Penn Central
and Sheffield.  Thus, we will examine whether the judgment in favor of
Maguire can stand on the strength of that theory.

II.              
Did Interference with Maguire’s Right to Drill Constitute a
Regulatory Taking for Which Compensation is Due?

The parties labor mightily to frame the central issue
on appeal so as to dictate a favorable result.  The complexity of inverse
condemnation law and the lengthy history of this dispute give both sides leverage
to work with as they seek purchase in their definitional wrestling match.

It is undisputed that Maguire’s efforts to drill a
gas well 300 feet from the shore of Lake Houston were thwarted in October 1991
when a stop work order was issued and Maguire’s drilling permit was revoked. 
These undisputed actions immediately stopped development at the well site;
drilling never resumed, and Maguire’s leases eventually lapsed.  According to
the jury, the City’s actions in October 1991 diminished the fair market value
of Maguire’s mineral estate by $2 million.

The appeal centers on this inquiry: Does interference
with Maguire’s property rights constitute a regulatory taking for which
compensation is required under the factors identified in Penn Central
and Sheffield?

This question leads others.  What precisely is the act
of regulatory interference at issue?  Is it, as the City contends, the passage in
1967 of an ordinance restricting drilling that did not apply to Maguire’s drill
site in 1991?  Or is it, as Maguire contends, the unwarranted enforcement of an
inapplicable ordinance?  Stated another way, can the erroneous enforcement of
an inapplicable ordinance by a City-employed final decision-maker constitute a
taking under Article I, sections 17 and 19 of the Texas Constitution?

The parties approach these questions from different
starting points.

The City focuses primarily on the ordinance’s inapplicability
to Maguire’s drilling site.  After vigorously contesting this issue earlier in
the litigation, the City now makes a virtue of necessity by embracing prior
holdings establishing that the ordinance did not apply to Maguire’s well site in
1991.  See Maguire II, 243 S.W.3d at 718 n.1; Maguire I, 69
S.W.3d at 360.  According to the City, the ordinance’s inapplicability means
(1) its employees acted without authorization when they erroneously
invoked the ordinance to prohibit drilling in 1991; and (2) the City lacked the
requisite intent to appropriate Maguire’s mineral interests for public use via
the inapplicable ordinance.

The City’s new tack in this appeal requires it to
abandon a long-held contention that the 1,000-foot prohibition did in fact apply
to Maguire’s proposed drill site in 1991.  It also requires the City to contradict
its prior representations to the trial court regarding its intent.  In trial
court briefing filed during the interim between the decisions in Maguire I and
Maguire II, the City asserted as follows: “The City’s intent in adopting
the Ordinance was to prohibit the drilling of oil and gas wells in the area
between the 45-foot contour and the 1000-foot line, whether such land is
located in the City or its extraterritorial jurisdiction.”  It also asserted: “[T]he
City adopted the Ordinance to protect Lake Houston.”  It further asserted: “The
Ordinance is inte[n]ded to further the City’s interest in protecting its
primary water supply, which certainly is at least as substantial an interest as
that upheld by the Court in Mayhew.”  

The City’s current appellate briefing does not
address whether the factors identified in Penn Central and Sheffield support
a determination that a taking has occurred.  The City has not challenged the
trial court’s weighing of those factors to conclude that a regulatory taking
occurred, and it has not challenged the sufficiency of the evidence underlying
any express or implied factual findings in support of the trial court’s
judgment.  Instead, the City contends more broadly that these factors
simply do not apply here because enforcement of the ordinance against Maguire in
1991 was unauthorized, and because the City lacked the requisite intent to
accomplish a regulatory taking by means of an ordinance that did not apply to
Maguire.

In contrast to the City’s approach, Maguire focuses primarily
on the enforcement of the inapplicable ordinance to prohibit
drilling in 1991.  According to Maguire, the final decision to prohibit
drilling in 1991 based on the ordinance (1) resulted in a compensable taking
regardless of the ordinance’s actual applicability to its drilling site; and
(2) demonstrated the City’s intent to prohibit the drilling of any wells within
1,000 feet of Lake Houston.

After setting the stage at length, we now address the
merits of the City’s two bases for attacking the trial court’s judgment in
favor of Maguire.

A.        Unauthorized
Acts

We reject the City’s first contention that a
regulatory takings claim is foreclosed because the City employees who shut down
Maguire’s operations acted without authorization.  

We note initially that the City did not raise its
“unauthorized acts” argument in the trial court.  In any event, the
“unauthorized acts” argument is unavailing because it relies upon inapposite case
law addressing waiver of sovereign immunity.  See City of El Paso v. Heinrich,
284 S.W.3d 366 (Tex. 2009); Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401
(Tex. 1997).

The City relies heavily upon the following sentence
from Heinrich:  “A state official’s illegal or unauthorized actions are
not the acts of the State.”  Heinrich, 284 S.W.3d 370 (quoting Fed.
Sign, 951 S.W.2d at 404).  By like token, the City contends that (1)
unauthorized acts by City decision-makers are not the acts of the City itself;
and (2) the drilling prohibition was “unauthorized” because the ordinance did
not apply.  Therefore, according to the City, “Heinrich and the numerous
cases that preceded it establish that an inverse condemnation claim was not the
proper remedy for addressing the unauthorized application of the 1,000'
Prohibition to Maguire’s proposed drill site.”  The City contends that the appellees
“should have sued Mr. Alexander and Ms. Kristaponis, in their official
capacities, to compel them to allow Maguire to drill at the proposed site,
which was located in an area not subject to the 1,000' Prohibition.”  

The City’s unauthorized acts argument fails because the
City erroneously attempts to graft standards from an entirely different context
addressing an entirely different issue — waiver of sovereign immunity — onto
the takings inquiry at issue here.

Heinrich did not address a takings claim.  See
Heinrich, 284 S.W.3d at 376 (“Heinrich has not alleged a takings
claim.”).  Heinrich focused on waiver of sovereign immunity.  Id.
 This case involves no question regarding subject matter jurisdiction or waiver
of sovereign immunity because sovereign immunity for takings claims is
expressly waived in Article I, sections 16 and 17 of the Texas Constitution.  In
short, the City’s “unauthorized acts” argument erroneously mixes apples and
oranges.  See Gen. Servs. Comm’n v. Little-Tex Insulation Co., 39 S.W.3d
591, 598 (Tex. 2001) (“Although sovereign immunity bar[red] . . .
breach-of-contract claims, the doctrine does not shield the State from an
action for compensation under the takings clause.”) (citations omitted).

The Texas Supreme Court has cautioned courts and
litigants that “it is often inappropriate” to treat cases involving a physical
taking as controlling precedents for analyzing a regulatory taking.  Lowenberg,
168 S.W.3d at 801-02.  This caution against reliance upon mix-and-match legal
analysis applies with even greater force when the City invites us to reach
completely beyond takings case law and import principles from a different body
of law addressing a different issue focusing on waiver of sovereign immunity. 
The City has identified no cases applying this sovereign immunity precept in
the context of a regulatory takings inquiry, and we are aware of no such cases.

The apples-and-oranges nature of the City’s argument
is underscored by its response to Maguire’s contention that the unauthorized
acts argument was waived because it was not raised in the trial court.  The
City responds that “a claim based on ultra vires conduct by governmental
employees implicates jurisdictional considerations” that can be raised at any
time.  This response confirms that the City is attempting to transform an
inquiry about whether a taking occurred into a jurisdictional-flavored inquiry
about whether sovereign immunity has been waived.  These are two different inquiries. 
We will not blend them.

Additionally, we note that the City’s “unauthorized
acts” contention conflicts with Maguire II.  We rejected the City’s
contention that Maguire failed to pursue the proper remedy against the City and
was required to appeal the revocation decision to the City Council.  Maguire
II, 243 S.W.3d at 720.  We further stated, “We also reject the City’s
contention that Maguire should have sought a writ of mandamus or injunction to
force the City to issue the permit in light of Maguire’s contention that
section 23-102 did not apply to the proposed drill site.”  Id. at 721.

The City’s attempt to limit the applicability of this
Court’s prior opinion in Maguire II is not persuasive.  The City argues that
Maguire II has no bearing on this appeal because that opinion focused on
a plea to the jurisdiction, and on an inquiry into whether Maguire’s claim was
ripe.  The City stresses that the current appeal comes to the appellate court
after a full trial on the merits, in contrast to the more limited record on
appeal from an order granting a plea to the jurisdiction.  However, the City
identifies no specific or material difference between the evidence proffered in
connection with the prior appeal from the grant of a plea to the jurisdiction and
the evidence proffered at trial with respect to (1) what actions were
undertaken by City employees; (2) the intent to foreclose drilling; and (3) the
basis for this intent to foreclose drilling. 

There are indeed record differences between the two
appeals because the amount of damages was tried following this Court’s remand
in Maguire II.  Additional testimony and evidence was introduced at
trial relating to other issues.  But we have been provided with no basis for
concluding that the records differ in any material respect regarding the two
issues upon which the City now hinges its appeal: (1) unauthorized acts, and
(2) intent in connection with enforcement of an ordinance that ultimately was
held to be inapplicable.  Differences in the record attributable to other
issues are not germane.

We therefore reject the City’s “unauthorized acts”
contention as a basis for arguing that the factors identified in Penn
Central and Sheffield do not apply here.  As we have noted above,
the City has not challenged the trial court’s final judgment or its findings of
fact and conclusions of law on grounds that the factors identified in Penn
Central and Sheffield were not established below.  Nor has the City
challenged the sufficiency of the evidence supporting the factors.  Instead,
the City has attempted an end-run around those factors; that attempt is
unsuccessful for the reasons discussed above.

Because we reject the City’s “unauthorized acts”
contention as a basis for arguing that the factors identified in Penn
Central and Sheffield are inapplicable in this case, we overrule the
City’s first issue.

B.        Intent to Take
Maguire’s Mineral Interests for Public Use

The City’s second issue focuses on intent.  The City  contends,
“[T]o recover on an inverse condemnation claim, a plaintiff must establish a
governmental entity acted with the intent to invoke its power of eminent domain
— i.e., the intent to take, damage, or destroy private property for
application to public use.”  The City further contends that such specific intent
is lacking here because the City did not intend to take, damage, or destroy
Maguire’s well by means of an ordinance that did not apply to Maguire’s well site
in 1991.

1.         Is intent
required?

To support its premise that intent must be
demonstrated, the City relies on cases involving claims for (1) physical damage
to private property attributed to improper construction, operation, or approval
of public works; and (2) breach of contract by a governmental entity.  See
City of Keller v. Wilson, 168 S.W.3d 802, 808 (Tex. 2005)
(flooding damage to property from construction of drainage ditch under plans
approved by city); City of Dallas v. Jennings, 142 S.W.3d 310, 313-14
(Tex. 2004) (flooding from improper operation of sewer line); Gen. Servs. Comm’n,
39 S.W.3d at 598-99 (contract dispute); City of Tyler v. Likes, 962
S.W.2d 489, 504-05 (Tex. 1997) (operation of culvert system caused flood damage
to home); City of Houston v. Renault, Inc., 431 S.W.2d 322, 323-24 (Tex.
1968) (operation and construction of public works alleged to have caused
flooding); Kerr v. Tex. Dep’t of Transp., 45 S.W.3d 248, 252 (Tex.
App.—Houston [14th Dist.] 2001, no pet.) (construction in watershed caused
flooding); TRST Corpus, Inc. v. Fin. Ctr., Inc., 9 S.W.3d 316,
323 n.4 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (breach of
contract); Green Int’l, Inc. v. State, 877 S.W.2d 428, 434 (Tex.
App.—Austin 1994, writ dism’d) (breach of contract); Waddy v. City of
Houston, 834 S.W.2d 97, 102 (Tex. App.—Houston [1st Dist.] 1992, writ
denied) (trespass based on presence of sewer line that crossed property).

None of these cases involve intent in the context of
an asserted regulatory taking under the factors identified in Penn Central
and Sheffield — much less the intentional but erroneous enforcement of an
ordinance against a target who later was determined to be beyond its reach.

We cannot reflexively borrow inverse condemnation
precedents from a non-regulatory context and apply them to a dispute arising
from an asserted regulatory taking.  See Lowenberg, 168 S.W.3d at
801-02 (“it is often inappropriate” to treat cases involving a physical taking
as controlling precedents for regulatory taking); see also Koch v. Tex. Gen.
Land Office, 273 S.W.3d 451, 459-60 (Tex. App.—Austin 2008, pet. filed)
(concluding that intent standard applicable in “circumstances in which the
governmental entity’s intentional act is not the actual physical taking or
damaging of property” cannot be applied when “the intentional act alleged is
the physical taking and dominion over the property at issue;” additionally, “it
has not been established that the Jennings intent standard applies
beyond the context in which it arose.”); City of San Antonio v. El Dorado
Amusement Co., 195 S.W.3d 238, 244-45 (Tex. App.—San Antonio 2006, pet.
denied) (“The longstanding distinction between acquisitions of property for
public use and regulations prohibiting private uses makes it inappropriate to
treat cases involving physical takings as controlling precedents for the
evaluation of a claim that there has been a regulatory taking.”).

The City essentially invites us to approach this
dispute as if it were a negligence case in which the negligent act is reliance
by City employees upon an inapplicable statute.  From this premise, the City (1)
analogizes to cases analyzing specific intent as the difference between
negligent and intentional acts in the context of physical takings involving situations
such as the operation of a drainage system that results in flood damage to private
property; and (2) asserts that it lacked specific intent to accomplish a taking.

We decline the City’s invitation to blur the
distinction between regulatory and physical takings in this manner, being mindful
of the Texas Supreme Court’s admonition to exercise care about mechanical
application to a regulatory taking situation of precepts from cases addressing
physical taking.  See Lowenberg, 168 S.W.3d at 801-02 (citing Tahoe-Sierra
Pres. Council, Inc., 535 U.S. at 323-24).  

In that regard, we note the analysis in City of
San Antonio, 195 S.W.3d at 244-45.  There, the court concluded that
physical and regulatory takings cannot necessarily be equated; thus, “intent” discussions
from a physical taking context cannot be applied in a regulatory context.  See
id.  At the same time, we note Maguire I’s suggestion that some
degree of intent is required in the regulatory taking context.  See Maguire
I, 69 S.W.3d at 358 (“An inverse condemnation may occur when the government
. . . unreasonably interferes with the landowner’s right to use and enjoy the
property, such as by restricting access or denying a permit for development.  To
maintain a cause of action for inverse condemnation, the plaintiff must prove .
. . an intentional governmental act . . . .”) (citations omitted).

We need not and do not decide the extent to which
“intent” must be established in a regulatory taking context as distinguished
from a physical taking context. Assuming that some level of governmental intent
to act must be established in this regulatory context, see Maguire I, 69
S.W.3d at 358, any such requirement is satisfied on this record by the
demonstrated and unequivocal intent of the City’s final decision-maker to
enforce the ordinance against Maguire to further the City’s goal of protecting
Lake Houston.  This conduct amounts to an “intentional governmental act”
regardless of whether the intentional act rested on an erroneous understanding
of the ordinance by the final decision-maker who enforced it.  Maguire’s rights
were no less interfered with because the City’s intentional act rested on an
erroneous interpretation of its own ordinance.

Such a conclusion comports with the City’s
contentions in the trial court that (1) “[t]he City’s intent in adopting the
Ordinance was to prohibit the drilling of oil and gas wells in the area between
the 45-foot contour and the 1,000-foot line, whether such land is located in
the City or its extraterritorial jurisdiction;” (2) “the City adopted the
Ordinance to protect Lake Houston;” and (3) “[t]he Ordinance is inte[n]ded to
further the City’s interest in protecting its primary water supply, which
certainly is at least as substantial an interest as that upheld by the Court in
Mayhew.”  See also Maguire I, 69 S.W.3d at 360 (summarizing
affidavit establishing that “other than the permit issued to Maguire, the City
has not issued a drilling permit for an oil, gas, or mineral well located
within 1,000 feet of Lake Houston since 1967.”)

Such a conclusion also comports with Maguire I’s
rejection of the City’s limitations defense.  Maguire I, 69 S.W.3d at
358-60.  The City argued that limitations began running in 1967 when the drilling
restriction was enacted.  Id. at 358.  Maguire contended that the
statute of limitations did not bar its action because the version of sections
23-101 and 23-102 in effect in 1991 did not apply to Maguire’s well site
located within city limits.  The Texarkana Court of Appeals rejected the City’s
limitations argument and noted that “the plain language of the ordinance
prohibits drilling only in the City’s [extraterritorial jurisdiction].”  Id.
at 360.  These circumstances confirm that the operative intentional governmental
act was the intentional enforcement of an inapplicable ordinance against
Maguire in 1991 — not the enactment of an inapplicable ordinance in 1967.

Treating the date of enactment as the operative
intentional act may make sense in appropriate circumstances in which the
targeted regulatory conduct is the enactment of a prohibition that does in fact
apply to limit an otherwise permissible exercise of private property rights.  See
Lowenberg, 168 S.W.3d at 802.  Doing so does not make sense when the
targeted regulatory conduct is the unwarranted enforcement of a prohibition
that does not apply but nonetheless is relied upon to thwart an
otherwise permissible exercise of private property rights.  The City’s approach
would create a Catch-22.  Although the ordinance was expressly invoked to
thwart the exercise of private property rights in the name of furthering a
substantial governmental interest, there is no remedy for the resulting
interference with those rights because the ordinance did not in fact apply to
Maguire and did not in fact further a substantial governmental interest with
respect to Maguire’s activities.  We cannot endorse this anomalous result.

This Court has recognized that a viable inverse
condemnation claim can be predicated on the City’s intentional but erroneous
enforcement of an ordinance that interferes with permissible activity by the
targeted entity.  City of Houston v. De Trapani, 771 S.W.2d 703 (Tex.
App.—Houston [14th Dist.] 1989, writ denied), abrogated on other grounds by
Tex. Educ. Agency v. Leeper, 893 S.W.2d 432, 444-46 (Tex. 1994)).  In De
Trapani, the City of Houston enacted regulations applicable to billboards
and gave billboard owners notice of the deadline for removal.  Id. at
704.  The owners removed their billboards in reliance on the City’s mistaken
reading of the ordinance, only to learn of the City’s error after the deadline
for erecting new billboards; this resulted in a loss of the owners’ business.  Id. 
The owners and the City agreed that the city’s original interpretation of the
ordinance was erroneous.  Id.  The owners sought compensatory relief
under 42 U.S.C. § 1983 and declaratory relief pursuant to chapter 37 of the
Texas Civil Practice and Remedies Code.  Id.  A jury concluded that the
City had effected an unconstitutional taking of property and awarded the owners
$500,000 in damages.  Id. 

On appeal, the City contested “liability under 42
U.S.C. § 1983 on the ground that no one ever executed official policy against
the plaintiffs.”  Id. at 705.  In that regard, the City argued that the
final authority to make policy resides exclusively in the City Council, and
that the sign administrator’s decisions were not attributable to the
municipality.  Id.  This court rejected the City’s argument and
acknowledged that section 1983 exists to remedy the violation of a
constitutional right.  See id. at 707-08.  Recognition of a viable
section 1983 action necessarily acknowledges a viable claim for the vindication
of an underlying constitutional right — in De Trapani, that right was to
not have property rights taken without compensation.  See id.  De Trapani
supports the result here because it recognizes that the intentional but
erroneous enforcement of an ordinance based upon the City’s mistaken
interpretation can give rise to an inverse condemnation claim.  

2.         Whose intent
matters?

The City also reprises its contention — rejected in Maguire
II and again in this appeal — regarding the identity of the actor who must
possess the requisite intent.

The City contends that “the City acts only through
its City Council.”  The City contends that the City Council’s only relevant
action was enacting the ordinance, which did not apply to Maguire in 1991. 
Therefore, the City asserts that it had no intent to impair Maguire’s mineral
interests.

This is a revised formulation of the already-rejected
contention that City employees were not final decision-makers, and that an appeal
to the City Council was required.  We have rejected a contention that the City
acts only through its council.  Maguire II, 243 S.W.3d at 719-20.  We
concluded, “[T]he director is the only person with authority to grant a
drilling permit,” and the director “is the relevant decision maker.”  Id.
at 719.  Our prior opinion squarely states:  “The City Council is not the [r]elevant
[d]ecision [m]aker.”  Id.

We further stated, “In [the] context of an inverse
condemnation case, the matter is not ripe unless the governmental entity
charged with implementing the regulation that allegedly caused the taking has
reached a final decision.”  Id. at 718 (citations omitted).  “A final
decision is prerequisite to ripeness in the context of regulatory takings and
related constitutional claims.  Id. (citing Mayhew, 964 S.W.2d at
929).  “That final and authoritative decision must be ‘of the type and
intensity of development legally permitted on the subject property [because a]
court cannot determine whether a regulation has gone ‘too far’ unless it knows
how far the regulation goes.’”  Id. (citing Mayhew, 964 S.W.2d at
929).  Maguire II held that “Maguire received a final administrative
decision.”  Id. at 720.

If the decision at issue is final and authoritative
enough to allow a determination about how far the regulation goes, then it is
final and authoritative enough to be the City’s decision.  

3.         Is there
evidence of intent?

The City also relies on the trial court’s finding of
fact number nine, which recites that Alexander and Kristaponis “did not intend
to prohibit the recovery of any minerals or otherwise take Appellees’ mineral
interests.”  This reliance is misplaced because there is no evidence to support
the trial court’s finding of fact number nine regarding the asserted intent of
Alexander and Kristaponis not to commit a taking.[9]
 

The City asserts that “Mr. Alexander and Ms.
Kristaponis intended only to protect Lake Houston by prohibiting Appellees from
drilling on a surface site just 300 feet from the lake — a location they believed
to be subject to the 1,000' Prohibition.  In doing so, they specifically did
not intend to prohibit the recovery of any minerals or otherwise take Appellees’
mineral interests.”  There is no evidence to support the City’s assertion
regarding intent to prohibit recovery of minerals.  The evidence adduced at
trial contradicts the City’s assertion that there was no intent to prohibit the
recovery of minerals by Maguire.

Kristaponis did not testify live or by deposition at
trial.  She signed a letter that appears as Plaintiff’s Exhibit 41.  This
letter says nothing about her intent or the City’s intent not to commit a
taking.  It recites her erroneous understanding of the ordinance and asserts
that the ordinance is applicable to Maguire’s permit for its Wheless No. 1 well
when, in fact, it was not applicable.  

Alexander testified by deposition at trial.  His deposition
testimony says nothing about an intent not to commit a taking.  Alexander
testified that a Lake Houston patrol contacted him after noticing Maguire’s
drilling site in October 1991.  Alexander inspected the drilling site and
informed his supervisor, Aghedo, about the drilling site location.  Alexander
testified that Deputy Assistant Director Hulbert instructed him to issue a stop
work order, and Alexander issued the stop work order on October 31, 1991.  Later,
Alexander delivered Kristaponis’s letter notifying Maguire that its drilling
permit has been revoked.  The stop work order and letter say nothing about the
intent of Alexander, Kristaponis, or the City not to commit a taking.

The City, acting through Deputy Assistant Director
Hulbert, intended to stop Maguire from drilling regardless of whether a permit
had been issued, and it had no intention of allowing Maguire to drill.

At trial, Hulbert testified by deposition as follows:

Q.: Was it important to you whether or not Maguire Oil
Company had a drilling permit for that location?

A.: The thing that was important to me is that they were
getting ready to drill, and I knew that if they had a permit, that it was done
in error by somebody.

Q.: So it didn’t make any difference to you, as far as you
were concerned?

A.: Not really.  I knew that we had to stop it. 

*                                  *                                  *

Q.: Talking specifically at the [November] meeting with Mr.
Vendig and representatives from Maguire Oil Company, did you tell Maguire and
their representatives that your department would not agree to any type of
exception, procedure or modification of the ordinance that would allow the
drilling of the well [at] the location that Maguire had selected?

A.: I did.

*                                  *                                  *

Q.: In fact, one of the discussions that was discussed at
the meeting in November of 1991 with representatives of Maguire was the
possibility of Maguire seeking an amendment or an exception to the ordinance.

A.: Yes.

Q.: Do you recall if that was discussed?

A.: Yes, sir.

Q.: Did any of the representatives of the City at that
meeting indicate they would support or agree to put forth such a proposal?

A.: No.

Q.: In fact, they rejected any type of proposal to amend or
change the ordinance?

A.: That’s correct.

*                                  *                                  *

Q.: To the best of your knowledge has there ever been any
ordinance authorizing the City of Houston to allow a well — I’m sorry, to allow
an exception to Section 23-102?

A.: Not to my knowledge.

*                                  *                                  *

Q.: What is your opinion as to how far a well would have to
be from the shore of Lake Houston before it would be a reasonable risk to
drill?

A.: I really — my answer would be I can’t quantify the
distance.

Q.: Could it be a mile or more? Five hundred? 5,000 yards?

A.: 5,000 miles would be better in my opinion.

We also consider Maguire’s
memoranda and meeting notes of November 6, 1991 and December 18, 1991.

            These notes
describe a meeting with City officials and confirm that the City was adamantly
and irrevocably opposed to drilling within 1,000 feet of Lake Houston due to
pollution concerns.

November 6, 1991 Maguire memorandum and notes excerpts:

[Maguire representatives] met with the following City of
Houston personnel:

Paul Bibler                Legal
Department

Roger W.
Hulbert     Deputy Asst. Director of Public Utilities in Charge of Water
Quality Control 

John Halet                 Health
Department

Hal Caton                  Planning
and Development Department

*                                              *                                              *

[Maguire representative] tried to point out that various things
that could be done on the surface and tried to prod them to tell us what their
concerns were so that we could attempt to address those concerns.

John Halet, with the Health Department, simply stated that
his boss was absolutely opposed to the drilling of the well in the location
proposed and would never support it in front of the City Council.

Roger Hulbert indicated that their main concern was
pollution; that there evidently was continuing seepage of salt water into the
lake, probably from old abandoned wells; and, that unless there were guarantees
that, even under a catastrophic circumstance such as a blowout, pollutants
would never enter the lake he would never support the change in the ordinance.

[Maguire representatives] tried to point out that the
ordinance was poorly written in that it didn’t have any procedures for
exceptions such as most ordinances do.  Roger [Hulbert] stated that he felt it
was written that way on purpose; that is, they did not ever want any drilling
within 1,000 feet.

*                                  *                                  *

December 18, 1991 Maguire memorandum and notes excerpts:

We wanted to discuss with the City of Houston additional
safe guards that they might want to see in place, but were unable to do so
because of their blanket approach that nothing would be drilled within 1000
feet of the lake.

Further, Water Quality
Control Senior Inspector Aghedo testified by deposition at trial that there is
no provision for an exception or variance of the 1,000 feet requirement in the
ordinance.  Finally, Planning and Development Senior Inspector Belveal
testified by deposition at trial that he did not know that ordinance section
23-102 existed until October 1991.  Beveal testified that his supervisor, Hal
Caton, informed him that Maguire’s drilling permit had been revoked because the
well would be drilled too close to Lake Houston.

Contrary to the City’s contention on appeal, the
evidence outlined above reflects the City’s intent to prohibit the recovery of
minerals by Maguire.  The ordinance’s inapplicability to Maguire’s drilling
site supports the conclusion that the City’s interference was unreasonable; the
ordinance’s inapplicability does not establish the absence of
interference, the absence of intent to prohibit recovery of minerals by Maguire,
or the absence of intent to commit a taking through enforcement of the
ordinance.  Thus, there is evidence that the City effected a taking when it
intentionally and unreasonably interfered with Maguire’s right to use and enjoy
its mineral estate.   

We overrule the City’s second issue.[10]

III.           
Maguire’s Cross-Appeal

Maguire challenges the trial court’s award of court
costs in its cross-appeal.  

In the trial court, Maguire filed a bill of costs after
the trial court signed its judgment asking the court clerk to tax deposition
fees as well as service fees, costs of certified copies, filing fees, and copy
costs for a total of $47,267.80.  The City filed its objection to Maguire’s
bill of costs on June 19, 2009.  The City asserted that Maguire’s proposed bill
of costs “includes such items as (i) depositions in another matter still
pending in the 55th District Court between the parties, (ii) filing fees in
appellate matters that are not part of this proceeding and (iii) copying costs
totaling $32,000.”  The City attached “a copy of the Bill of Costs prepared for
this case by the Harris County Clerk, totaling $11,289.04.”  The City asked the
trial court to “adjudge costs in the amount of $11,289.04 in accordance with the
Harris County Clerk’s Bill of Cost” because Maguire’s proposed bill of costs is
“outside the taxable costs allowed by law.”  The court signed its order on July
24, 2009 awarding Maguire $9,144.30 in court costs. 

In two issues, Maguire argues on cross-appeal that
the trial court erred by denying recovery of (1) “court reporter fees incurred
for use in the suit, but prior to the time the case was filed in County Court
at Law No. 4;” and (2) “photocopy costs when the photocopies were demanded by
the City or required by court order.”

Texas statutes and rules delineate which items the
court may and may not include as taxable costs.  See Hatfield v. Solomon,
316 S.W.3d 50, 66 (Tex. App.—Houston [14th Dist.] 2010, no pet.); Gumpert v.
ABF Freight Sys., Inc., 312 S.W.3d 237, 239 (Tex. App.—Dallas 2010, no
pet.) (“The general rule in Texas is that expenses incurred in prosecuting or
defending a suit are not recoverable as costs unless recovery for those items
is expressly provided for by statute, rule, or under principles of equity.”).  Rule
131 provides that “[t]he successful party to a suit shall recover of his
adversary all costs incurred therein, except when otherwise provided.”  Tex. R.
Civ. P. 131.  

The term “costs” has a particular meaning in this
context.  “Costs” usually encompass fees and charges required by law to be paid
to the courts or some of their officers, the amount of which is fixed by
statute or the court’s rules; examples include filing and service fees.  Hatfield,
316 S.W.3d at 66.  Costs within the meaning of Rules 125 through 149 are those
items in the clerk’s bill of costs.  Id.; see also Tex. R. Civ.
P. 125–49.  Whether a particular expense is recoverable under statute or rule
as court costs is a question of law, which is reviewed de novo.  Gumpert,
312 S.W.3d at 239.  The allocation of costs is a matter for the trial court’s
discretion and cannot be overturned on appeal absent an abuse of discretion.  Hatfield,
316 S.W.3d at 66-67; Gumpert, 312 S.W.3d at 239.  

Under Rule 141, the trial court has discretion, for
good cause stated on the record, to allocate costs in a manner other than as
provided by law or the Texas Rules of Civil Procedure.  See Tex. R. Civ.
P. 141.  Therefore, the trial court has the power to tax costs contrary to the
applicable default rule — for example, to a party who is not the “successful
party” under Rule 131.  Hatfield, 316 S.W.3d at 67.  However, this power
to allocate costs in a manner different from the norm does not encompass the
power to tax as “costs” items that are not normally allowed as taxable court
costs.  Id.  Generally, expenses incurred in prosecuting or defending a
lawsuit are not recoverable as costs in Texas, unless permitted by a statute or
equitable principle.  Id.  Under the Texas Civil Practice and Remedies
Code, a party may recover fees of the clerk and service fees due to the county;
court reporter fees for the original of stenographic transcripts; and such
other costs and fees permitted to be awarded by other rules and statutes.  See
Tex. Civ. Prac. & Rem. Code Ann. § 31.007(b) (Vernon 2008).

A.        Court
Reporter Fees for Stenographic Transcripts

Maguire argues that it is entitled to recover approximately
$3,000 in additional court reporter fees it incurred for certain deposition
transcripts.  The City contends that these excluded court reporter fees arise
from depositions that do not pertain to the inverse condemnation claim tried in
the County Civil Court at Law Number Four.  According to the City, these fees
and depositions relate to other claims that remained in the 55th District Court
after Maguire dismissed the inverse condemnation claim and re-filed it in the
County Civil Court at Law Number Four.  Maguire responds that two agreed orders
establish that “all depositions and written discovery taken in the 55th
District Court would be treated as if they were taken in the county court at
law;” therefore, according to Maguire, the trial court should have awarded to Maguire
as “costs” the fees incurred for these depositions.

            As a threshold
matter, we note the City’s waiver argument.  The City contends that “[t]he
Costs Order reflects that the trial court considered evidence at a hearing on
Maguire’s motion for an award of court costs.”  The City argues that “[i]f the
trial court considered evidence, the failure to file a Reporter’s Record
containing that evidence requires this Court to presume that the trial court’s
proceedings support the Costs Order.”  According to the City, Maguire waived
any trial court error by failing to file a reporter’s record of the hearing.  The
City also argues that Maguire failed to (1) correlate the disputed deposition
court reporter fees to the inverse condemnation claim; and (2) “present
evidence showing any deposition officer’s certification for any depositions as
required by Rule 203.2 of the Texas Rules of Civil Procedure.”

            We reject the
City’s waiver argument because we do not need a hearing transcript to decide
whether the agreed orders apply here.  We note that the City did not complain
in the trial court that “Maguire did not present evidence showing any
deposition officer’s certification for any depositions as required by Rule
203.2.”  It may not raise its complaint now for the first time on appeal. 

We also reject the City’s contention that Maguire
cannot recover the disputed court reporter fees because they relate to
depositions taken in connection with other claims remaining in the 55th
District Court.  The January 11, 2005 and the October 2, 2008 agreed orders
were signed by the trial court and the City’s counsel.  They provide in
pertinent part:  “All written discovery and oral depositions conducted in the
case . . . in the 55th Judicial District Court of Harris County Texas shall
have the full force and effect as if conducted in this proceeding.”  That “full
force and effect” encompasses the effect of awarding court reporter’s fees for
purposes of the award of costs in the inverse condemnation claim tried in
County Civil Court at Law Number Four.

The agreed orders do not differentiate between
deposition transcripts pertaining to Maguire’s inverse condemnation claim in
County Civil Court at Law Number Four and deposition transcripts pertaining to remaining
claims in the 55th District Court.  “[F]ull force and effect” relates to all
depositions; nothing in the orders excludes other claims, if any, or limits the
“full force and effect” language to depositions pertaining specifically to Maguire’s
inverse condemnation claim.

We conclude that Maguire was entitled to recover
court reporter fees it incurred for deposition transcripts in the County Civil Court
at Law Number Four and in the 55th District Court as submitted in its bill of
costs.  The trial court’s failure to award these fees is an abuse of
discretion.  We sustain Maguire’s first issue on cross-appeal.

B.        Photocopy
Expenses

In its second issue, Maguire contends that the trial
court erred by denying recovery as court “costs” of $32,059.92 in photocopy expenses
associated with the production of documents requested by the City.  Maguire
argues that it can recover these photocopy expenses as “costs” under Civil
Practice and Remedies Code section 31.007(b)(4) and Texas Civil Procedure Rule
196.6.

Without deciding whether the expense of responding to
discovery can be treated as  court “costs” for purposes of a bill of costs, we
reject Maguire’s contention.  Assuming that such expenses can be characterized
in this manner, Maguire’s bill of costs did not establish that its photocopy
expenses were attributable to responding to document requests from the City as
opposed to general copy costs in litigation.  Therefore, the trial court did
not abuse its discretion in denying recovery of those expenses as court “costs”
under the provisions invoked by Maguire.

Accordingly, we overrule Maguire’s second issue on
cross-appeal.

Conclusion

We overrule the City’s issues and affirm the trial
court’s final judgment.  We sustain Maguire’s first issue on cross-appeal and modify
the trial court’s order on court costs to include the additional deposition
fees incurred by Maguire as set out in its bill of costs.  We overrule
Maguire’s second issue on cross-appeal.  We affirm the trial court’s order on
award of court costs as modified.

 








                                                                                    

                                                            /s/                    William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Seymore,
Boyce, and Christopher.

 

 









[1]
We refer to the numerous appellees collectively as “Maguire.”





[2]
This is the fourth appeal spawned by this litigation.  In chronological order,
the first three appeals are (1) Maguire Oil Co. v. City of Houston, 143
F.3d 205 (5th Cir. 1998); (2) Maguire Oil Co. v. City of Houston, 69
S.W.3d 350 (Tex. App.—Texarkana 2002, pet. denied); and (3) Maguire Oil Co.
v. City of Houston, 243 S.W.3d 714 (Tex. App.—Houston [14th Dist.] 2007,
pet. denied).





[3]
Maguire’s inverse condemnation claim was premised on (1) the Fifth and
Fourteenth Amendments to the United States Constitution; and (2) Sections 17
and 19 of Article I of the Texas Constitution.  Maguire Oil Co., 143
F.3d at 206 n.1.  





[4]
Maguire’s inverse condemnation claim was dismissed from district court and
re-filed in County Civil Court at Law Number Four because this court held in Taub
v. Aquila Southwest Pipeline Corp., 93 S.W.3d 451, 456 (Tex. App.—Houston
[14th Dist.] 2002, no pet.), that “the county courts at law have exclusive
jurisdiction over condemnation and eminent domain cases.”  Maguire II,
243 S.W.3d at 718 (citing Taub, 93 S.W.3d at 456).  





[5]
A “regulatory action that generally will be deemed a per se taking” and,
thus, requires just compensation occurs “where government requires an owner to
suffer a permanent physical invasion of property — however minor.”  Lingle
v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005); see also Sheffield,
140 S.W.3d at 671.





[6]
“[R]egulations that completely deprive an owner of ‘all economically
beneficial us[e]’” of his property are deemed per se takings.  Lingle,
544 U.S. at 538 (quoting Lucas v. S. Carolina Coastal Council, 505 U.S.
1003, 1019 (1992)) (emphasis in original); see also Sheffield,
140 S.W.3d at 671. 





[7]
A regulatory taking occurs when the government has unreasonably interfered with
a property owner’s right to use and enjoy his property considering the
following three factors: (1) “the economic impact of the regulation on the
claimant;” (2) “the extent to which the regulation has interfered with distinct
investment-backed expectations;” and (3) “the character of the governmental
action.”  See Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124
(1978); Sheffield, 140 S.W.3d at 672.





[8]
The government cannot require a person to give up a constitutional right — such
as the right to receive just compensation when property is taken for a public
use — in exchange for a discretionary benefit conferred by the government where
the benefit has little or no relationship to the property.  Lingle, 544
U.S. at 547 (citing Dolan v. City of Tigard, 512 U.S. 374 (1994)); see
also Rischon Dev. Corp. v. City of Keller, 242 S.W.3d 161, 167 (Tex.
App.—Fort Worth 2007, pet. denied).





[9]
In its brief, Maguire challenged the trial
court’s finding of fact number nine.  In its reply brief, the City argued that
Maguire had waived any challenge to the trial court’s findings of fact; the
City did not point to any evidence supporting finding of fact number nine.  We reject the City’s contention that a sufficiency
challenge to finding of fact nine should not be considered because it has been
waived.  Maguire adequately challenged the evidence supporting finding of fact
nine in footnote 26 of its brief.  In any event, this Court is not bound by a
finding of fact for which there is no evidentiary support even when that
finding is unchallenged on appeal.  McGalliard v. Kuhlmann, 722 S.W.2d
694, 697 (Tex. 1986).





[10]
In light of our disposition, we need not address Maguire’s contention that the
trial court’s takings finding can be affirmed based on other takings theories
asserted in the trial court.